[Crim. No. 1312. Fourth Dist. Aug. 19, 1957.]

THE PEOPLE, Respondent, v. LONNIE ANDREWS et al., Appellants.

334

Robert A. Ward and William O. Hogan, under appointment by the District Court of Appeal, for Appellants.

Edmund G. Brown, Attorney General, and Morris Schachter, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendants Andrews, Hyman and Scott, together with one Marshall, were charged with a violation of section 11500 of the Health and Safety Code in that on July 14, 1956, they did wilfully and unlawfully have in their possession a certain narcotic. Andrews was also charged with one prior conviction, and Scott with six prior convictions. All four defendants pleaded not guilty and Andrews and Scott admitted the prior convictions. A jury was waived and all four defendants were found guilty after a trial by the court. A motion for a new trial by Scott and Hyman was denied and probation was denied as to all four defendants. Andrews has appealed from the judgment, and Hyman and Scott have appealed from the judgment and from the order denying a new trial.

With the few exceptions hereafter noted, the evidence was uncontradicted. ■ An officer of the narcotic detail of the San Diego Police Department had received information from a confidential informant on July 14, 1956, and from another informant about a week before, that narcotics were being used and sold at a certain house in San Diego. He had also received similar information from people in the neighborhood for several weeks up to a day or two before July 14. He knew all four defendants and knew that they were all users of heroin, and had seen known users going and coming from this address on an average of two to four times a week. On

the morning of July 14, he received information from an informant whose information had proved reliable in the past that the occupants of this house were going to Tijuana to pick up some heroin, and that if they were unable to get money with which to make the purchase they would trade a television set for the heroin. This informant had named these four defendants as the occupants of the house.

On the morning of July 14, this officer stationed himself at a point where he was able to keep this house under observation. At about noon on that day he saw the four defendants drive up to this house in an automobile. Andrews unlocked a padlock on one door of the house and replaced the padlock after Marshall, Hyman and Scott had entered that door. He then went around and entered the house by another door. After waiting a few minutes this officer walked down the alley and through an opening in the fence, which opening was about five feet from the house, and approached an open window which faced the alley. He saw Andrews, Marshall and Hyman seated close together on a divan and Scott seated in an overstuffed chair, facing them. Scott was about three feet from the other three, and there was a vanity stool between him and the other three. They were all about 14 feet from the window at which this officer was standing. As this officer stood at the window he saw a spoon, the bottom of which was black from soot or smut, a medicine dropper with a hypodermic needle attached leaning against an ash tray, and a pile of papers folded like a ''bindle fold,'' in the manner in which narcotic users fold a paper when they have placed heroin in it. All of these articles were on the vanity stool about which the defendants were seated.

This officer then climbed through the window and told the defendants to keep their seats. A split second later he saw Marshall reach with her right hand and grab at the stack of papers on the vanity stool, saw Hyman grab the medicine dropper with the needle attached and it disappeared behind her, and saw Andrews lean forward slightly and his left arm drop. About that time two other officers entered the room. One of the officers raised Marshall's hand and picked up seven papers folded into bindle form. He had her rise and found three more such papers under her hip. These bindles contained heroin. Another officer picked up a dropper with a hypodermic needle attached which was between Hyman and Marshall on the divan. One of the officers had Scott get up from the chair in which he was seated and, in a ''funny

book'' lying on the cushion, there was a dropper with a needle attached, and a spoon that had a sooty botton with cotton in the bowl of the spoon. The spoon and cotton contained a narcotic. One of the officers found a package containing six marijuana cigarets under the edge of the divan where Andrews was seated, directly down from where the officer had seen him moving his hand. A spoon with cotton in the bowl was on the vanity stool. This spoon contained an opium alkaloid and the cotton contained heroin. Another hypodermic needle and a box of cotton pellets, which are used by some addicts to strain their narcotics through, and a jar and glass each full of warm water, were also found on the vanity stool. Two small knives having one blade open were found on the arm of the chair in which Scott was seated, and a third knife was on the vanity stool. Knives such as these can be used to cut the papers which are folded in bindle form to contain narcotics, and are often used to measure out the narcotics for the papers. Letters were found addressed to Scott, Hyman and Andrews at this address. There was evidence that Andrews rented this house, and that Scott and Hyman were living there. Some ointment was found on the arm of the chair in which Scott was seated. Two pieces of cloth which appeared to have been used as a tourniquet were found on the divan.

There was evidence that such spoons are used by narcotic users by placing the powder and water in the spoon and applying heat to the bottom of the spoon to dissolve the powder; that such cotton is used as a strainer to keep any solid substance from getting into the dropper; and that such tourniquets are used to make the vein easier to hit with the needle. When Scott was interviewed on July 16, an officer asked him what the ointment was used for, and he replied: "Why, you know, just rub," and he rubbed the marks on his arm. When the officers asked him why none of them were "high" when arrested he said: "We just didn't have time to fix." On the arms of defendant Marshall there were numerous old marks and on the veins of her hands and wrists were about 60 marks less than two weeks old. On the arms of Andrews there were 12 to 15 marks less than two weeks old. On the arms and wrists of Hyman there were 8 or 9 marks less than two weeks old, and on the left arm of Scott from 8 to 10 marks. The marks on Scott's arm "showed they had been worked over with some kind of ointment."

The defendants Marshall and Andrews did not testify and

offered no evidence in their behalf. The defendant Hyman testified that she did not touch anything on the table when the officer entered, and that she did not own any of the items found there and none of them were under her control. She also testified that she had been to Tijuana that morning, that she had not ''fixed,'' and that ''It is possible I would have, but I didn't.'' Scott testified that he had been sitting in the chair about 10 minutes; that the knives were on the vanity stool and not on the chair; that he did not know he was sitting on the items found in the funny book; that the officer did find the ''outfit'' in the funny book on which he was sitting; that he had gone to Tijuana, but he did not know who had purchased this heroin and marijuana; and that he did not own, had no control over, and had no right to do anything with any of the items in any of the exhibits.

All three appellants contend that all of the evidence against them was erroneously admitted over the objection that the evidence was secured by an illegal search and seizure. It is argued that the officer was outside of the house for several hours and had sufficient time in which to have secured a search warrant; that the attitude of the police was to make an arrest regardless of what rights of the defendant would be violated; that when the officer went up to the window he intended to go into the house and fish for evidence regardless of what he saw; that the officer was in an illegal position when he stood at the window, since he had walked five feet over private property; and that under the cases cited in *People* v. *Martin*, 45 Cal.2d 755 [290 P.2d 855], looking into a window is excusable, under the search and seizure rule, only when the officer is in a place where he has a right to be.

The evidence concerning the information the officers had, in advance, was sufficient in itself to show that they had reasonable or probable cause for these arrests. (*People* v. *Maddox*, 46 Cal.2d 301 [294 P.2d 6]; *People* v. *Gonzales*, 141 Cal.App.2d 604 [297 P.2d 50].) The objects which the officer saw through the window, and the position of the parties showing they were apparently preparing to take a ''fix,'' were additional factors supporting his belief that they were committing a felony in his presence, and were preparing for a further illegal activity. While there was a seizure here there was very little search since nearly all of the objects were in sight and it would violate every element of common sense to hold that such search as does appear was unreasonable under

the circumstances. ■ The mere looking through a window cannot reasonably be held to be an "unreasonable" search and seizure. (*People* v. *Martin,* 45 Cal.2d 755 [290 P.2d 855]; *People* v. *Ruiz,* 146 Cal.App.2d 630 [304 P.2d 175]; *People* v. *Montes,* 146 Cal.App.2d 530 [303 P.2d 1064].) An officer does not have to close his eyes to what is in open view before him. (*People* v. *Roberts,* 47 Cal.2d 374 [303 P.2d 721].) In *Hester* v. *United States,* 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898], the court said: "It is obvious that even if there had been a trespass, the above testimony was not obtained by an illegal search and seizure." In *Martin* v. *United States,* 155 F.2d 503, the court said: "The Fourth Amendment secured the people against not all, but only unreasonable searches and seizures of their persons, houses, papers, and effects. Enclosed or unenclosed grounds or open fields around their houses are not included in the prohibition." No reversible error appears in the admission of the evidence which is here questioned.

The appellants Scott and Hyman also contend that there was no substantial evidence to support the verdict as against them. It is argued as to each of them that there is no evidence that they had actual possession of any narcotic; that all of the evidence was of items which "would be expected to be found in Andrews' home"; that merely sitting in Andrews' living room is not evidence that they had possession of narcotics; that the most that the evidence shows is that they were addicts and were hoping to get a shot of heroin from Andrews; and that all of the evidence is consistent with their innocence of the charge of possession.

■ The evidence, with the reasonable inferences therefrom, is sufficient to support a finding that these appellants had knowledge of, and a joint dominion and control over, these narcotics to the extent necessary to sustain a conviction. The evidence justifies the inference that they were jointly engaged in preparing to use the items received in evidence. These appellants were also living at the house at the time, and all of the defendants were together under circumstances which reasonably indicate that they were about to use the items in question and act together in receiving shots. There was' evidence that the appellant Hyman had a hypodermic needle in her hand containing heroin, and that she tried to conceal it. She practically admitted that she intended to receive a shot and would have received one if they had not been interrupted. It is highly improbable that the appellant Scott had nothing

to do with the hypodermic needle and spoon on which he was sitting, and there was some direct evidence which justified the inference that he was in possession of a narcotic. The evidence indicates that these parties were all there for the same purpose, that they were jointly in possession of the heroin, and it is sufficient to support the implied finding to that effect.

The judgment and order are affirmed.

Mussell, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied October 16 and October 18, 1957, respectively.