[L.A. No. 29989. In Bank. June 20, 1973.]

RICHARD CARL LORENZANA, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[L.A. No. 29990. In Bank. June 20, 1973.]

HUMBERTO SALAS, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

(Consolidated Cases.)

## COUNSEL

Richard S. Buckley, Public Defender, James L. McCormick, Michael Rothschild, Harold E. Shabo and Frank H. Horowitz, Deputy Public Defenders, and Walter Culpepper for Petitioners.

No appearance for Respondent.

Joseph P. Busch, District Attorney, Harry Wood and Harry B. Sondheim, Deputy District Attorneys, for Real Party in Interest.

## Opinion

**TOBRINER, J.**—The crucial question we face here is whether a citizen may properly be subjected to the peering of the policeman who, without a search warrant, walks over ground to which the public has not been invited but which has been reserved for private enjoyment, stands by a window on the side of a house and peeks through a two-inch gap between the drawn window shade and the sill, and thus manages to observe the conduct of those within the residence. We conclude that the questioned police procedure too closely resembles the process of the police state, too dangerously intrudes upon the individual's reasonable expectancy of privacy, and thus too clearly transgresses constitutional principle; the prosecution cannot introduce into evidence, and the courts cannot be tainted with, that which the intrusion yields.

We shall point out that the cases recognize the distinction between the observations of a police officer who has positioned himself upon property which has been opened to public common use, and the observations of an officer who ventures onto property which has not been so committed. A sidewalk, pathway, common entrance or similar passageway offers an implied permission to the public to enter which necessarily negates any reasonable expectancy of privacy in regard to observations made there. The officer who walks upon such property so used by the public does not wear a blindfold; the property owner must reasonably expect him to observe all that is visible. In substance the owner has invited the public and the officer to look and to see. But by the same reasoning, the officer who intrudes upon property not so open to the public enjoys no such prerogatives.

By separate petitions petitioners here seek writs of mandate to set aside orders of the Los Angeles Superior Court denying their motions to suppress evidence obtained as a result of police observation into petitioner Lorenzana's home. Because the petitions involve identical facts and issues of law, we consolidated them for purposes of this review. We begin with a statement of the uncontested facts of the case as drawn from the testimony of police officers adduced at the preliminary examination and the suppression hearing held pursuant to Penal Code section 1538.5.

On May 27, 1971, Sergeant Charles Myers of the Narcotics Division of the Los Angeles Police Department received information from a "confidential reliable informant"[1] that an individual named Richard was "deal-

---

[1] According to Sergeant Myers, the informant had previously given tips which had led to five narcotics arrests. Of these five, four were held to answer, and as of the date of the preliminary examination, one of those four had been convicted. In the

ing" in heroin at 368 North Avenue 53. The informant told Sergeant Myers that he had gone to the address with another person, and that the person had "scored," or bought heroin.[2] According to the informant, upon receiving an order for heroin, Richard would go somewhere else and pick it up. At approximately 10 p.m. on the day they received this information, the police proceeded to the address which the informant had given them. The officers neither attempted to, nor did, procure a search or arrest warrant.

The dwelling at the designated address, a single family house, was set back about 70 feet from the sidewalk. The front door to this dwelling did not face the public street on the north, but instead was on the west side of the building. A rear door opened on the south side. Officer Myers testified that access to the house was from the west. There were no doors or defined pathways on the east side of the house, and a strip of land covered with grass and dirt approximately six to ten feet in width separated the east side of the dwelling from an adjacent apartment driveway.

Upon arriving at the address, Sergeant Myers circled behind the apartment, walked down the adjacent driveway, crossed onto the strip of petitioner Lorenzana's property, and positioned himself at a window on the east side of the house. The window had been fully closed. The window glass was intact. The window shade had been drawn, but a gap of about two inches had been left between the window sill and the bottom of the shade. Gaps of about one inch or so had been left on each side of the shade, but a thin curtain also hung down on the sides of the window.

Sergeant Myers testified that he had trespassed onto petitioner Lorenzana's property because he could not see into the house from the adjacent driveway or from the street. In fact, he could not see into the dwelling until he was within five or six inches of the window. The officer further testified that he knew that the property onto which he trespassed was not a common-use area but belonged to the dwelling at 368 North Avenue 53. Sergeant Myers did not have permission to go upon the property.

Myers placed his face within an inch of the window on the east side of the house and stood there for approximately 15 minutes. During this time he overheard a telephone conversation in which a man inside said, "If you want to cop, you can come over. I will have to pick the stuff up," and, "Someone's coming over that I am going to pick up for now, and I'll get

---

case in which the arrestee was not held to answer, Sergeant Myers testified narcotics were nonetheless found where the informant said they would be.

[2]Sergeant Myers was not sure whether the informant told him when he acquired this personal knowledge, but believed it was either one or two days before the conversation.

yours when I return." Three or four minutes later, Sergeant Myers observed, through the aperture at the bottom of the window, a man go to the front door and talk with someone in the doorway. A moment later both men left the location, and Myers notified officers in the field to follow them.

The officers followed the man who had been in the house, later identified as petitioner Lorenzana, to an apartment. They observed him knock on the door, and petitioner Salas answered. Although the officers did not see any objects actually transferred, they thought that Lorenzana and Salas might have exchanged something.

Thirty minutes after he had left the house at 368 North Avenue 53, petitioner Lorenzana returned. Police resumed their surveillance at the window on the east side of the house, and observed petitioner Lorenzana empty the powdery contents of a tied-off rubber balloon onto a newspaper. Concluding that the substance was heroin, the officers went to the door, announcing, "You are under arrest for narcotics violations. Open the door." Hearing running movements, the officers reasoned that evidence was being destroyed; they forced entry into the house, arresting petitioner Lorenzana and two others, and recovering a small amount of heroin.

Sergeant Myers radioed the news of the arrests and recovery of heroin to officers waiting at petitioner Salas' apartment. Upon receiving the call, the officers went to Salas' apartment, announced, "Police officers. You're under arrest for narcotics violations," and hearing movements within, they forced their way into the apartment. The police then arrested defendant Salas and recovered nine balloons of heroin which he had attempted to throw to the floor upon their entry. The officers also recovered a can of milk sugar, often used for "cutting" heroin before sale. Because of the amount of heroin recovered, as well as the can of milk sugar, the police concluded that petitioner Salas possessed the narcotics for sale. Contending that the search at Lorenzana's house violated constitutional precepts and that the evidence described above was obtained as a fruit of that unlawful search, petitioners seek suppression of the evidence seized in both of their homes.

With this background in view we proceed to a brief survey of the California cases. We shall show that in evaluating the reasonableness of searches under the state and federal Constitutions (Cal. Const., art. 1, § 19; U.S. Const., 4th Amend.), the decisions differentiate between the police officer, who, acting without a warrant, observes activities in a private residence while standing upon a part of the surrounding property that has been opened, expressly or impliedly, to public use, and the officer who, in such circumstances, stands upon property not so committed.

In *People* v. *Willard* (1965) 238 Cal.App.2d 292 [47 Cal.Rptr. 734], police officers without a warrant went upon the defendant's property, and from the steps leading up to a side door of defendant's house, through a screen door, observed illegal activity. In concluding that "there was no substantial, if any, degree of privacy to the area" (*id.* at p. 307), the court pointed out that the door appeared to have been a normal means of access to and egress from the house and that the sidewalk from the property line to this door was used by persons other than the occupants of the house; while the officer stood on the sidewalk, which enjoyed public use, he could constitutionally observe illegal activity in plain view inside the house.

*People* v. *Berutko* (1969) 71 Cal.2d 84 [77 Cal.Rptr. 217, 453 P.2d 721] involved a situation in which the officers went to a common passageway bordering defendant's apartment, and from there observed contraband through an aperture in the curtains which the defendant had drawn. Noting that the case involved "observation by an officer from a place *where he had a right to be* and through an opening which defendant had provided through his arrangement of drapes covering the window" (*id.* at p. 91 (italics added and deleted)), the court held that the police had not violated constitutional limits by observations which they drew from an area in which they were "lawfully present." (*Id.* at p. 94.)

We faced the same issue in *People* v. *Bradley* (1969) 1 Cal.3d 80 [81 Cal.Rptr. 457, 460 P.2d 129]. In that case a police officer proceeded to the rear of defendant's back yard, and observed plants growing in the yard "a scant 20 feet from the defendant's door to which presumably delivery men and others came" (*id.* at p. 85). Closer scrutiny revealed the plants to be marijuana.[3] Based on these facts a majority of this court held

---

[3]In *Bradley* the majority and the dissent appear to agree that if evidence is in plain sight from an area of common use, it may be seized without a warrant, but if that evidence is discovered only by encroachment into an area within defendant's reasonable expectation of privacy, the evidence is not admissible. *Bradley* itself presented a borderline case—the marijuana plants may possibly have been visible from the defendant's door, twenty feet away, but could not be identified as marijuana until the officer approached within a foot of the plants—and the close division of the court in *Bradley* (three judges dissented) reflects the difficulty of that case. .

An analogous fact situation was similarly resolved in *People* v. *Superior Court* (1968) 264 Cal.App.2d 165 [70 Cal.Rptr. 362] where, from the street, a plant could be seen growing behind an undraped window. Since the plant was visible to anyone passing the house on a public street, the court held that officers did not engage in a search when they approached the window in order to determine whether the plant was marijuana. In *People* v. *King* (1970) 5 Cal.App.3d 724 [85 Cal.Rptr. 461] contraband in defendant's backyard was "visible from the driveway many feet away." (*Id.* at p. 727.) Since the driveway provided a normal access route to the house, officers did not encroach upon a reasonable expectation of privacy when they observed the contraband while standing on the driveway.

that the officer did not violate constitutional rights in his act of discovering and later seizing the plants.[4]

Other cases illustrate the converse situation in which the officer stations himself at a place which is *not* open to the public. Thus, in *Pate* v. *Municipal Court* (1970) 11 Cal.App.3d 721 [89 Cal.Rptr. 893], the Court of Appeal evaluated the conduct of police officers who, in order to observe obscene movies being shown inside a motel room, climbed onto a second-story trellis and so posted themselves "at a considerable distance from any public vantage point" (*id.* at p. 724). Finding that the defendants had exhibited a reasonable expectation of privacy in drawing the curtains over a window in order that observations could not be made from any area open to public use, the court determined that the officers' search from the trellis constituted an unreasonable governmental intrusion, necessitating suppression of the evidence obtained as a result of that search. (Accord, *People* v. *Myles* (1970) 6 Cal.App.3d 788 [86 Cal.Rptr. 274].) Likewise the court in *People* v. *Cagle* (1971) 21 Cal.App.3d 57 [98 Cal.Rptr. 348] sustained a finding that police officers transgressed constitutional limits by looking through defendant's bathroom window, which "was at the rear of the house, situated far from all normal access routes" (*id.* at p. 65).

Similarly, in *Cohen* v. *Superior Court* (1970) 5 Cal.App.3d 429 [85 Cal.Rptr. 354], the Court of Appeal held that a police search conducted from a fire escape into an upstairs window might prove unlawful, since as a matter of fact the fire escape might not constitute a common area "except during an emergency evacuation" (*id.* at p. 435); during such an evacuation, the occupants might nonetheless reasonably expect that evacuees would not peer into their room. Ordering a hearing of this factual question, the appellate court held that the trial court erred in ruling that the search was reasonable per se.

Finally, in *Mann* v. *Superior Court* (1970) 3 Cal.3d 1 [88 Cal.Rptr. 380, 472 P.2d 468], we addressed the actions of officers who, in order to obtain a clear view into the defendant's house, positioned themselves next to the window, inside a group of bushes that blocked the window view from the property's "public" areas. After observing "what was going on in the house" from this "vantage point," the officers then obtained the

---

[4]For similar factual situations in which police searches from "common areas" were held to be not unreasonable, see also *People* v. *Colvin* (1971) 19 Cal.App.3d 14 [96 Cal.Rptr. 397]; *Vickery* v. *Superior Court* (1970) 10 Cal.App.3d 110 [88 Cal.Rptr. 834]; *People* v. *Landry* (1969) 276 Cal.App.2d 370 [80 Cal.Rptr. 880]; *People* v. *King* (1965) 234 Cal.App.2d 423 [44 Cal.Rptr. 500]; *People* v. *Holloway* (1964) 230 Cal.App.2d 834 [41 Cal.Rptr. 325]; *People* v. *Steffano* (1960) 177 Cal.App.2d 414 [2 Cal.Rptr. 176]; *United States* v. *Hersh* (9th Cir. 1972) 464 F.2d 228.

consent of the house's occupants to conduct a search. In concluding that this consent vitiated the defendants' claim to protection under constitutional provisions, we "assumed without deciding that the officers violated petitioners' constitutional right to privacy by looking through the window while trespassing in the shrubbery. outside."[5] (*Id.* at p. 7.)

■ These cases clearly demonstrate the salutary rule of law that observations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense. On the other hand, when observations are made from a position to which the officer has not been expressly or implicitly invited, the intrusion is unlawful unless executed pursuant to a warrant or one of the established exceptions to the warrant requirement.[6] ■ In the instant case, it is undisputed that the officers had not obtained a warrant, that conditions warranting the application of an exception to the warrant requirement did not exist,[7] and that the officers did not make their observations from a position to which they were expressly invited; hence, unless they were *implicitly* invited to the place from which they made their observations, the officers' conduct cannot be upheld.

[5] *People* v. *Aguilar* (1965) 232 Cal.App.2d 173 [42 Cal.Rptr. 666] contains reasoning to the contrary. In that case officers observed activity while standing in shrubbery between an apartment building and a public street. The court rejected the contention that "looking through the apartment window from a vantage point not open to the public constituted an illegal search." (*Id.* at p. 176..) To the extent that the. holding in *Aguilar* conflicts with our holding today, it is disapproved.

[6] *People* v. *Andrews* (1957) 153 Cal.App.2d 333 [314 P.2d 175] cannot be read as holding otherwise. In *Andrews* an officer "walked down the alley and through an opening in the fence, which opening was about five feet from the house, and approached an open window which faced the alley." (*Id.* at p. 335.) The officer observed illegal activity through the window and then climbed through the window to arrest the defendants. It is possible that the opening in the fence indicates that the officer approached the house by a normal access route and that because of the open window the illegal activity was visible from the alley only five feet from the house and presumably open to public use. These considerations, however, are not developed in the opinion since the court ruled that the officer had probable cause to arrest these defendants on the basis of information obtained before he entered the alley; thus, *Andrews* is inapplicable to the instant case.

[7] In *People* v. *Sirhan* (1972) 7 Cal.3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121], a police officer had been stationed in the rear yard of the Sirhan residence soon after the Kennedy assassination in order to keep intruders away. While throwing a paper cup into a box of trash in the yard, the officer noticed, in plain sight, a letter in the trash and retrieved that evidence. Although the *Sirhan* opinion analyzed this particular seizure in "reasonable expectation of privacy" terms, the *Sirhan* decision as a whole makes clear that the officer's presence in the rear yard was justified by the exigencies of the unique circumstances surrounding the assassination of a presidential candidate (7 Cal.3d at pp. 739-740), and thus the legality of the seizure is easily explainable since the evidence was in plain sight from an area in which the officer had a right to be.

All of the evidence produced at the preliminary examination and the suppression hearing demonstrated that the officers could not see into the residence from either the public street or the adjacent apartment driveway. Indeed Officer Myers testified that he could neither see nor hear anything inside the Lorenzana home until he came within five or six inches of the window on the east side of the dwelling. The trial court's denial of defendants' motion to suppress can be sustained only by a finding that an implicit invitation offered by the observable characteristics of the house and surrounding property gave the officers the right to position themselves only six inches away from that window. An examination of the record, however, reveals no substantial evidence to support such a finding.

The evidence revealed that the six-foot-wide strip of property immediately adjacent to the window through which the observations were made is covered with dirt and grass, that there is no sidewalk or pathway leading past the window from any direction, that the side of the house containing the window does not contain a door, and that the main entrance, or front door, is on the opposite side of the house. Officer Myers testified that normal access to the house would be from the side containing the main entrance and that the land adjacent to the window was not a common use portion with other buildings.[8] None of this evidence could support a finding that normal approach to the Lorenzana home would lead the public to within six inches of the window in question.

The evidence also thoroughly rebuts an inference that the six-foot strip served as a normal access route to the rear door of the Lorenzana home or to the house behind on the same lot. First, that evidence shows that there are bushes toward the rear of the house on the east side containing the window. Although the extent of obstruction is not revealed, it is reasonable to conclude that these bushes represent a significant hindrance to anyone proceeding to the rear of the house by way of this strip of land only six feet wide. Second, the rear door of the Lorenzana home is situated on the west side of a vestibule protruding out of the rear of the structure. Since the door faces west and in fact is not even visible from the east, it would be unreasonable to infer that someone normally approaching the rear door would proceed down the east side past the window, clear around the vestibule, and finally to the door rather than proceeding by the more direct route down the west side of the house past the main entrance. Third, Officer Myers testified that the land beneath the window did not appear to be in common use by the occupants of any adjacent buildings. Since Myers

---

[8]To the question, "So then according to your observation it [the land] was not a common use portion with other buildings, or with other residences was it?" Officer Myers answered, "No."

approached the Lorenzana home from the rear and saw the house behind it on the same lot, his testimony strongly undercuts an inference that access to the other house would be by way of the strip of land that passes by the window in question. That inference is further weakened by the existence of an alley on the south side of the other house, making it unreasonable to eschew access by way of that alley and choose instead access by passing from the street some 100 feet away and down the east side of the Lorenzana home.

■ While this court must view the evidence in the light most favorable to the trial court's order,[9] we also cannot ignore "the well established rule [that] our function is to determine whether substantial evidence supports it." (*People* v. *Cagle* (1971) 21 Cal.App.3d 57, 62 [98 Cal.Rptr. 348].) The record reveals no substantial evidence supporting a conclusion that a normal access route to either the Lorenzana home or the house behind it on the same lot would lead to a point within a scant six inches from the window through which the officers made their observations; thus, those observations were made from a position where the officers had no right to be. Since neither a warrant nor one of the established exceptions to the warrant requirement sanctioned this intrusion, it was unlawful.

■ The fact that apertures existed in the window, so that an unlawfully intruding individual so motivated could spy into the residence, does not dispel the reasonableness of the occupants' expectation of privacy. (See, e.g., *People* v. *Cagle* (1971) *supra*, 21 Cal.App.3d 57; *Pate* v. *Municipal Court* (1970) 11 Cal.App.3d 721 [89 Cal.Rptr. 893]; *People* v. *Myles* (1970) 6 Cal.App.3d 788 [86 Cal.Rptr. 274].) To the contrary, the facts of this case demonstrate that by drawing the window shade petitioner Lorenzana exhibited a reasonable expectation to be free from surveillance conducted from a vantage point in the surrounding property not open to public or common use. Surely our state and federal Constitutions and the cases

---

[9]In *People* v. *Rice* (1970) 10 Cal.App.3d 730 [89 Cal.Rptr. 200] a police officer, while proceeding to the rear yard of a house under surveillance, detected the odor of burning marijuana emanating from an open window. The court stated that "absent evidence to the contrary, it may be reasonably assumed that he simply used a route normally used for access to that area." (*Id.* at p. 739.) That assumption would not be reasonable in the instant case since there was considerable evidence concerning the physical characteristics of the house and surrounding property and none of that evidence indicated that the area immediately adjacent to the window was part of a normal access route. For similar reasons, *People* v. *Superior Court* (*Kusano*) (1969) 276 Cal.App.2d 581 [81 Cal.Rptr. 42], *Fraher* v. *Superior Court* (1969) 272 Cal.App.2d 155 [77 Cal.Rptr. 366], *People* v. *Covan* (1960) 178 Cal.App.2d 416 [2 Cal.Rptr. 811], and *People* v. *Alexander* (1967) 253 Cal.App.2d 691 [61 Cal.Rptr. 814], where the character of property from which observations were made was not discussed, have no application to the instant case.

interpreting them foreclose a regression into an Orwellian society in which a citizen, in order to preserve a modicum of privacy, would be compelled to encase himself in a light-tight, air-proof box. The shadow of 1984 has fortunately not yet fallen upon us.

Our holding that police officers conduct an unreasonable search under the above circumstances conforms to the reasoning of the United States Supreme Court's definitive decision in *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]. In that case, which evaluated the government's right "to introduce evidence of the petitioner's end of telephone conversations, overheard by FBI agents who had attached an electronic listening and recording device to the outside of the public telephone booth frcm which he had placed his calls" (*id.* at p. 348 [19 L.Ed.2d at p. 580]), Mr. Justice Stewart comprehensively defined the Fourth Amendment as protecting an individual's "privacy upon which he justifiably relied." (*Id.* at p. 353 [19 L.Ed.2d at p. 583].)[10] Rejecting the theory that the Fourth Amendment applied only to "constitutionally protected areas," the *Katz* court declared: "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." (*Id.* at pp. 351-352 [19 L.Ed.2d at p. 582].)

The factual setting of *Katz,* involving the use of a telephone booth which was accessible to the public, necessitated Mr. Justice Stewart's delineation of the Fourth Amendment's scope in the generic terms of "reasonable expectations of privacy." Because of the telephone booth's public accessibility, as contrasted to that of the noncommon area surrounding a private residence, the booth clearly could not be deemed a "constitutionally protected area"; the *Katz* court rejected application of that standard to "the problem presented by this case," noting that "we have never suggested that this concept can serve as a talismanic solution to every Fourth Amendment problem." (389 U.S. at p. 351 & fn. 9 [19 L.Ed.2d at p. 582].) Applying its broadly defined standard, the *Katz* court held that "[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." (389 U.S. at p. 353 [19 L.Ed.2d at p. 583].)

---

[10]In accord with the *Katz* rationale, we have held that "an appropriate test" of the scope of constitutional protection, in light of geography and other relevant factors, "is whether the person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion." (*People* v. *Edwards* (1969) 71 Cal.2d 1096, 1100 [80 Cal.Rptr. 633, 458 P.2d 713].)

In a similar fashion, the generic *Katz* rule permits the resident of a house to rely justifiably upon the privacy of the surrounding areas as a protection from the peering of the officer unless such residence is "exposed" to that intrusion by the existence of public pathways or other invitations to the public to enter upon the property. This justifiable reliance on the privacy of the non-common portions of the property surrounding one's residence thus leads to the *particular* rule that searches conducted without a warrant from such parts of the property *always* are unconstitutional unless an exception to the warrant requirement applies. Mr. Justice Harlan, concurring in the *Katz* decision, nicely summarizes this point: "Generally, . . . the answer to that question [of what protection the Fourth Amendment extends] requires reference to a 'place'. . . . Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited." (389 U.S. at p. 361 [19 L.Ed.2d at pp. 587-588].)

Pursuant to the principles of *Katz,* therefore, we do not rest our analysis exclusively upon such abstractions as "trespass" or "constitutionally protected areas" or upon the physical differences between a telephone booth and the land surrounding a residence; we do, however, look to the conduct of people in regard to these elements. Taking into account the nature of the area surrounding a private residence, we ask whether that area has been opened to public use; if so, the occupant cannot claim he expected privacy from all observations of the officer who stands upon that ground; if not, the occupant does deserve that privacy. Since the eavesdropping officer in the case before us stood upon private property and since such property exhibited no invitation to public use, we find that the officer violated petitioner Lorenzana's expectations of privacy, and hence, his constitutional rights.

The People do not contest the conclusion that the occupants of the Lorenzana residence entertained a reasonable expectation of privacy, but contend that "for purposes of the Fourth Amendment there is a difference of constitutional dimension between electronic eavesdropping, which involves the use of mechanical devices, and simple eavesdropping or surreptitious observation, which involves only the use of some of man's five senses." The danger to the privacy of citizens from electronic eavesdropping is far greater, the People assert, than from "the eavesdropper or 'peeping Tom' traditionally known to the law"; the electronic eavesdropper "imposes a much greater threat to the principles underlying the Fourth Amendment."

Whatever the relative and speculative dangers of "electronic" compared to "simple" surveillance, the constitutional distinction which the People at-

tempt to draw does not pass the clarifying scrutiny which the United States Supreme Court decision in *Katz* v. *United States* imparts to the Fourth Amendment. We now recognize the constitutional encasement which renders inviolable the individual's reasonable expectation of privacy; any governmental intrusion into that privacy is an "unreasonable search" within the meaning of the Fourth Amendment, whether that intrusion be the traditional physical search (e.g., *People* v. *Edwards* (1969) 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713]) or a surreptitious auditory invasion (e.g., *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507] (electronic); *United States* v. *Case* (7th Cir. 1970) 435 F.2d 766 (non-electronic)) or indeed visual intrusion (e.g., *People* v. *Triggs* (1973) 8 Cal.3d 884 [106 Cal.Rptr. 408, 506 P.2d 232]; *Britt* v. *Superior Court* (1962) 58 Cal.2d 469 [24 Cal.Rptr. 849, 374 P.2d 817]; *Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602 [21 Cal.Rptr. 552, 371 P.2d 288]).

The People further contend, however, that the police "had probable cause to arrest petitioner" based upon information from a reliable informant and that they had knowledge that petitioner was obtaining narcotics from somebody else; hence, "rather than making an arrest" the police could investigate, by means of a deliberate search, "to ascertain the identity of [the] supplier." As the People themselves recognize, such an argument as "probable cause," was rejected by the United States Supreme Court in *Katz* v. *United States* (1967) *supra,* 389 U.S. 347. █ The contention ignores the well-established principle that, except for certain well-delineated and non-applicable exceptions, no quantum of "probable cause" will justify a warrantless search.

As the court in *Katz* explained: ". . . this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end. Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' *Agnello* v. *United States*, 269 U.S. 20, 33, for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police. . . .' " (389 U.S. at pp. 356-357 [19 L.Ed.2d at p. 585]; accord, *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 450-451 [29 L.Ed.2d 564, 573-574, 91 S.Ct. 2022]; *Vale* v. *Louisiana* (1969) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969]; *People* v. *Henry* (1967) 65 Cal. 2d 842, 845 [56 Cal.Rptr. 485, 423 P.2d 557].)

In brief, the People's proposed rule would transform probable cause to *arrest* into an authorization to *search* without a warrant, a rule which could

not pass constitutional muster. Although the officers who went to 368 North Avenue 53 indeed may have had probable cause to arrest the occupant, that probable cause did not entitle them to conduct a warrantless exploratory search for other evidence against the occupant. Again quoting *Katz*, "Whatever one's view of 'the long standing practice of searching for other proofs of guilt within the control of the accused found upon arrest,' [citation] the concept of an 'incidental' search cannot readily be extended to include surreptitious surveillance of an individual either immediately before, or immediately after, his arrest." (389 U.S. at pp. 357-358, fn. 20 [19 L.Ed.2d at p. 586].)

■ The People finally contend that even if we hold that the police surveillance violated constitutional requirements, as, indeed, we have concluded, the case should still be remanded to the trial court to enable the People to argue that the contested evidence, instead of constituting the "fruit" of that illegality, would, in any event, have been discovered. Such a result, however, would negate the purpose for which Penal Code section 1538.5 establishes the pretrial suppression hearing; namely, to avoid the continued relitigation of the question of the admissibility of evidence.

In this case, petitioners presented a motion to suppress the evidence on the grounds that it was the fruit of an illegal search; the petitioners and the People submitted that question on the basis of testimony taken at the preliminary examination as well as that adduced at the suppression hearing. All parties faced the obligation of presenting all their testimony and arguments relative to the question of the admissibility of the evidence at that time. If the People had other theories to support their contention that the evidence was not the product of illegal police conduct, the proper place to argue those theories was on the trial level at the suppression hearing. The People offered no such argument at that hearing and may not do so for the first time on appeal. To allow a reopening of the question on the basis of new legal theories to support or contest the admissibility of the evidence would defeat the purpose of Penal Code section 1538.5 and discourage parties from presenting all arguments relative to the question when the issue of admissibility of evidence is initially raised.[11] (*People* v. *Superior Court* (1971) 14 Cal.App.3d 935, 939, fn. 1 [92 Cal.Rptr. 545]; see *People* v. *Miller* (1972) 7 Cal.3d 219, 227 [101 Cal.Rptr. 860, 496 P.2d

---

[11]*People* v. *Edwards* (1969) 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713], cited by the People for its procedural contention, is inapposite. While the *Edwards* court recognized that an arrest following an illegal police search is not necessarily always the "fruit" of that illegality, the court in *Edwards* did not remand the case to the trial court for a new suppression hearing, but rather overturned the conviction on the ground of erroneously admitted evidence; the case was, of course, subject to attempted reprosecution by the district attorney.

1228]; *People* v. *Superior Court* (1972) 7 Cal.3d 186, 198-199 [101 Cal. Rptr. 837, 496 P.2d 1205]; *Thompson* v. *Superior Court* (1968) 262 Cal.App.2d 98, 109 [68 Cal.Rptr. 530].)

In sum, the prying policeman, clandestinely peering through a two-inch aperture between drawn blinds and windowsill, standing upon trespassed property over which the public has not been expressly or impliedly invited, portrays a sorry figure who violates his subject's right of privacy—a right protected by the California and United States Constitutions and precious to a free and open society.

Let peremptory writs of mandate issue as prayed.

Wright, C. J., Mosk, J., and Sullivan, J., concurred.

**BURKE, J.,** Dissenting.—The majority holds that "when observations are made from a position [on private residential property] to which the officer has not been expressly or implicitly invited, the intrusion is unlawful unless executed pursuant to a warrant or one of the established exceptions to the warrant requirement." According to the majority, "A sidewalk, pathway, common entrance or similar passageway offers an implied permission to the public [including the officer] to enter . . . ." The majority's holding is contrary to decisions of this court and of the Courts of Appeal, and is not compelled by any United States Supreme Court decision cited by the majority.

One of the cases contrary to the majority's holding is *People* v. *Bradley,* 1 Cal.3d 80 [81 Cal.Rptr. 457, 460 P.2d 129], which held that the prohibitions against unreasonable searches and seizures were not violated by the officer's discovery and seizure of marijuana plants in a rear yard area under the circumstances there appearing. *Bradley* applied the "reasonable expectation of privacy" test adopted in *People* v. *Edwards,* 71 Cal.2d 1096, 1100 [80 Cal.Rptr. 633, 458 P.2d 713], and theretofore set forth in *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]. Nowhere in *Bradley* does it appear that the officer's observation of the marijuana plants was made from a location to which he had been expressly or implicitly invited.

The majority in the instant case suggests that in *Bradley* the marijuana plants "may possibly have been visible from defendant's door." This suggestion is pure speculation. A dissent in *Bradley* by the author of the present majority opinion observed (at p. 91) that "no evidence . . . indicates whether the marijuana plants were visible from [defendant's] doorway," and the *Bradley* majority did not dispute that observation but

evidently regarded the lack of such evidence as not of critical importance. Furthermore, even if the plants could have been seen from the doorway, it does not appear in *Bradley* that the officer's observation was made from that location.

The "keep on the pathway or the like" restriction imposed on the police by the majority herein was advocated by the *Bradley* dissent[1] but was properly rejected by a majority of this court in that case.

Another case contrary to the majority opinion in this case is *People* v. *Sirhan,* 7 Cal.3d 710, 741-744 [102 Cal.Rptr. 385, 497 P.2d 1121] (cert. den. 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1382]), wherein this court held unanimously that the prohibitions against unreasonable searches and seizures were not violated by an officer's discovery and seizure of an envelope in a trash bin in the back yard of the Sirhan residence under the circumstances there appearing. *Sirhan* applied the "reasonable expectation of privacy test" and relied upon cited authority including *Bradley.* Nowhere in *Sirhan* does it appear that the officer's observation of the envelope was made from a location to which he had been expressly or implicitly invited.

The majority, in attempting to distinguish *Sirhan,* states that *Sirhan* "as a whole makes clear that the officer's presence in the rear yard was justified by the exigencies of the unique circumstances surrounding the assassination of a presidential candidate (7 Cal.3d at pp. 739-740)" and that the evidence was in plain sight from an area in which the officer had a right to be. The pages in *Sirhan* cited by the majority, however, were not concerned with the officer's presence in the yard when he found the envelope but with a search and seizure inside the Sirhan residence on the prior day. The *Sirhan* opinion, in sustaining the admissibility of the envelope, applied the "reasonable expectation of privacy test" and did so in a manner that is in accord with the *Bradley* majority and contrary to the instant majority opinion.

Another case contrary to the majority opinion is *People* v. *Alexander,* 253 Cal.App.2d 691 [61 Cal.Rptr. 814], which held that the officer's discovery of marijuana in the chimney of a barbecue in the rear yard of a single-family residence did not constitute an unreasonable search. *Alexander* stated that under cited decisions the "uninvited entry" of an officer on private residential property outside a house does not by itself make inadmissible the evidence obtained thereby and that an important

---

[1]The dissent stated (1 Cal.3d 80, 91), "The defendant could reasonably expect that members of the public calling at his residence would stay in the approximate vicinity of the door and pathway, would see only what can be seen from that viewpoint, and that the balance of the yard was private."

factor is " 'the degree of privacy which defendant enjoyed in the place involved.' " Nowhere in *Alexander* does it appear that the officer's observation of the marijuana in the barbecue chimney was made from a location to which he had been expressly or implicitly invited.

The majority attempts to distinguish *Alexander* on the ground that there the "character of property from which observations were made was not discussed"—presumably meaning that there was no discussion whether the officer was on a pathway or the like. *Alexander* evidently regarded that matter as not determinative. It would be nonsense to say that the police may walk over and examine the inside of the chimney of a barbecue in the backyard of a private residence if there is a pathway to the barbecue but may not do so if the yard contains dirt or grass and no identifiable pathway.

Other cases implicitly contrary to the majority opinion include, for example, *People* v. *Superior Court* *(Kusano)*, 276 Cal.App.2d 581, 587 [81 Cal.Rptr. 42]; *Fraher* v. *Superior Court,* 272 Cal.App.2d 155, 159 [77 Cal.Rptr. 366] [disapproved on another issue in *People* v. *Fein,* 4 Cal.3d 747, 755, fn. 3 (94 Cal.Rptr. 607, 484 P.2d 583)]; *People* v. *Superior Court* *(Gaffney)*, 264 Cal.App.2d 165, 166-168 [70 Cal.Rptr. 362]; *People* v. *Covan,* 178 Cal.App.2d 416, 418 [2 Cal.Rptr. 811]; *People* v. *Andrews,* 153 Cal.App.2d 333, 335, 338 [34 P.2d 175]; see generally Witkin, Cal. Evidence (2d ed. 1966) § 105.

I turn next to whether the officers' conduct in going upon the strip of land adjacent to Lorenzana's house and from that vantage point looking through his window and listening to the conversation violated the constitutional prohibitions against unreasonable searches and seizures (U.S. Const., 4th and 14th Amends.; Cal. Const., art. I, § 19).

The superior court, following arguments by counsel as to whether the officers' conduct violated Lorenzana's "reasonable expectation of privacy," denied petitioners' motion to suppress evidence,[2] and the Court of Appeal thereafter denied the instant petitions for mandamus. For the reasons hereinafter stated I agree with the actions of those courts.

The evidence, viewed in the light most favorable to the superior court's ruling *(People* v. *Cagle,* 21 Cal.App.3d 57, 62 [98 Cal.Rptr. 348]; see

---

[2]From the remarks of counsel for Lorenzana's codefendants it appears that the defense sought to suppress testimony regarding what the police observed and heard through the window of Lorenzana's residence and the contraband thereafter found inside that residence and inside the Salas' residence.

*Horack* v. *Superior Court,* 3 Cal.3d 720, 732, fn. 1 [91 Cal.Rptr. 569, 478 P.2d 1] [dissent]), may be summarized as follows:

On May 27, 1971, Police Officer Myers received from a confidential reliable informant the information recited by the majority relating to the sale of heroin at 368 North Avenue 53 in Los Angeles, and about 9 or 10 p.m. on that same date Myers proceeded without a warrant to that address.

The house at that address was a single family dwelling, which was set back about 15 yards from the sidewalk. Behind the house (front house) on the same lot was a second house (back house), and next door to the east was an apartment-hotel.

The front door to the front house did not face the street to the north but was on the west side of the dwelling. The rear door was in the middle, roughly, of the south side and on a vestibule protruding from that side; there was no door on the east side. The evidence does not establish whether paths had been constructed on the premises.[3] There was "dirt surrounding the house" and "dirt" or "dirt and grass" on a six- to twelve-foot wide strip that was between the driveway of the apartment-hotel and the east side of the house in question.

Officer Myers walked up the driveway of the apartment-hotel and stepped onto the adjacent six- to twelve-foot strip. He did not know whether the strip was owned by the apartment-hotel owner or the owner of the house in question but thought it was probably owned by the latter. No other evidence of its ownership was introduced.

While on that strip he looked through a window on the east side of the house. He was then standing on dirt. No fence separated the window from

---

[3] The majority opinion is misleading in stating "Officer Myers testified that access to the house was from the west. There were no . . . defined pathways on the east side of the house." The quoted statements might be viewed as indicating that, according to Myers, the sole way of approach through the yard to the house was on the west side of the house. Myers did not so indicate. The majority evidently relies on the following examination of Myers by defense counsel: "Q. The rear door is on the south side and opens toward the west; is that correct? A. That is correct. Q. And the front door is on the west side at the north end, and opens toward the west also; is that correct? A. Yes. Q. So access to this house would be from the west side; is that correct? A. Yes." The last answer, in view of its context, obviously meant that access to the house was from the west in that the doors opened toward the west. Such testimony does not indicate that the sole way of approach to the house through the yard was on the west side of the house. Myers was also asked by defense counsel, "There is no . . . pathway between the driveway to the apartment building and the east side of 368 North Avenue 53, is there?," and he replied, "There may be a path there, I don't know. There is some dirt . . . ."

the apartment-hotel driveway, nor were there any fences on the north of the property or, so far as appears, elsewhere on the property. Three bushes were about ten feet south of the window and three feet away from the house.

The bottom of the window was about five feet from the ground. The window was closed. A shade inside the window was partially drawn but between the bottom of the shade and window sill was a gap about two and a half or three inches and gaps of about one to one and a half inches were on either side of the shade. There was a "thin porous-type material" that was "to the sides of the window." Through the bottom and side apertures the officer made the observations recited by the majority during a period of about 15 minutes. He was then "maybe six inches" from the house. While standing at the same location he also overheard the conversation the majority describes. He could not have made the observations or overheard the conversation had he remained in the apartment-hotel driveway, nor does it appear that he could have done so from the public sidewalk or street.

Following Myers' initial observations the matters ensued which are described by the majority, including, among other things, the further observations by the police through the same window.

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment (*Mapp* v. *Ohio,* 367 U.S. 643, 655-657 [6 L.Ed.2d 1081, 1089-1091, 81 S.Ct. 1684]), provides, "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated , . . . ." An essentially identical guarantee of personal privacy is contained in article I, section 19, of the California Constitution.[4]

Reference to reasonable expectations of privacy as a Fourth Amendment touchstone received the endorsement of the United States Supreme Court in *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]. (See also *Terry* v. *Ohio,* 392 U.S. 1, 9 [20 L.Ed.2d 889, 898-899, 88 S.Ct. 1868].) In *Katz,* an eavesdropping case, the United States Supreme Court declared (at p. 353 [19 L.Ed.2d at p. 583]) that "The Government's activities, in electronically listening to and recording the petitioner's words [in a public telephone booth] violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted 'a search and seizure' within the meaning of the Fourth Amendment" and (at p. 357 [19 L.Ed.2d at p. 585]) that "searches conducted outside

---

[4]On at least one occasion, however, we have afforded defendants broader security against unreasonable searches and seizures than that afforded by the rule applied in federal courts. (See *People* v. *Martin,* 45 Cal.2d 755, 759-761 [290 P.2d 855].)

the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment [fn. omitted] subject only to a few specifically established and well-delineated exceptions [fn. omitted]."[5] Since in *Katz* the officers acted without a warrant and none of the exceptions applied, the search and seizure failed to comply with constitutional standards.

In accord with *Katz* we have declared that an appropriate test in determining whether there has been an unlawful search is "whether the person has exhibited a reasonable expectation of privacy, and if so, whether that expectation has been violated by unreasonable governmental intrusion." (*People* v. *Krivda,* 8 Cal.3d 623 [105 Cal.Rptr. 521, 504 P.2d 457]; *People* v. *Sirhan, supra,* 7 Cal.3d 710, 741-743; *People* v. *Bradley, supra,* 1 Cal.3d 80, 84; *People* v. *Edwards, supra,* 71 Cal.2d 1096, 1100; in accord, *People* v. *Triggs,* 8 Cal.3d 884, 891 [106 Cal.Rptr. 408, 506 P.2d 232].)

In *People* v. *Berutko,* 71 Cal.2d 84, 91 [77 Cal.Rptr. 217, 453 P.2d 721], wherein an officer, from the vantage point of a common area adjacent to the defendant's apartment, looked into that apartment through an aperture in the drapes, which apparently was small in size,[6] this court rejected unanimously a claim that "the officer's act of looking through the aperture was itself an unreasonable search and a violation of defendant's right of privacy." *Berutko,* inter alia, quoted the following language from *State* v. *Smith,* 37 N.J. 481 [181 A.2d 761] [cert. den. 374 U.S. 835 (10 L.Ed.2d 1055, 83 S.Ct. 1879)], " 'Peering through a window or a crack in a door or a keyhole is not, in the abstract, genteel behavior, but the Fourth Amendment does not protect against all conduct unworthy of a good neighbor. Even surveillance of a house to see who enters and leaves is something less than good manners would permit. But it is the duty of a policeman to investigate, and *we cannot say that in striking a balance between the rights of the individual and the needs of law enforcement, the Fourth Amendment itself draws the blinds the occupant could have drawn but did not.'* (Italics added.)" (See also, American Law Institute, A Model Code of Pre-Arraignment Procedure (Official Draft No. 1) pp. 161-162.)[7]

---

[5] For other cases supporting this latter principle see, e.g., *Mancusi* v. *DeForte,* 392 U.S. 364, 370 [20 L.Ed.2d 1154, 1160, 88 S.Ct. 2120]; *Camera* v. *Municipal Court,* 387 U.S. 523, 528 [18 L.Ed.2d 930, 935, 87 S.Ct. 1727].

[6] *Berutko* states (at p. 88, fn. 2) that the officer testified, " 'The drape was up on top of the table, and it was resting on a box. By looking in through this opening or this area that I could see, a matter of *a few square inches* into the room . . . .' " (Italics added.)

[7] The American Law Institute, A Model Code of Pre-Arraignment Procedure (Official Draft No. 1, at pp. 161-162), states, "to look in through windows and doors

It was similarly held in *People* v. *Guerra,* 21 Cal.App.3d 534, 537-538 [98 Cal.Rptr. 627], that the conduct of an officer in eavesdropping by placing his ear to the door of defendant's apartment in the area of the hinges and possibly the peephole did not violate the defendant's "constitutional right to privacy."

Neither *Berutko* nor *Guerra* involved a situation where the officer's observation or eavesdropping was secured from a vantage point gained by trespass, and in the instant case the officers' observations and eavesdropping may have been secured from such a vantage point. However, even if the officers committed a technical trespass in walking on the strip of land adjacent to Lorenzana's residence, that fact, although relevant to the question whether the officers violated the latter's reasonable expectation of privacy (see, e.g., *People* v. *Edwards, supra,* 71 Cal.2d 1096, 1104), is not alone conclusive on that question (see, e.g., *Hester* v. *United States,* 265 U.S. 57 [68 L.Ed. 898, 44 S.Ct. 445]; *People* v. *Bradley, supra,* 1 Cal.3d 80, 83-85; *People* v. *Terry,* 70 Cal.2d 410, 426-428 [77 Cal.Rptr. 460, 454 P.2d 36] [cert. den. 399 U.S. 911 [26 L.Ed.2d 566, 90 S.Ct. 2205], rehg. den. 400 U.S. 858 (27 L.Ed.2d 97, 91 S.Ct. 26)]; *People* v. *Superior Court (Kusano), supra,* 276 Cal.App.2d 581, 587; *People* v. *Superior Court (Gaffney), supra,* 264 Cal.App.2d 165, 168; *People* v. *Willard,* 238 Cal.App.2d 292, 298 et seq. [47 Cal.Rptr. 734]; *People* v. *King,* 234 Cal.App.2d 423, 428-433 [44 Cal.Rptr. 500]). Where officers have merely trespassed across a yard to obtain their view of activities inside a house, it is necessary to consider "the nature of the physical surroundings and the degree to which those surroundings made it clear that the areas where the police trespassed were intended to be private." (See *Mann* v. *Superior Court,* 3 Cal.3d 1, 11 [88 Cal.Rptr. 380, 472 P.2d 468] [dissent by Peters, J.].)[8]

Here the strip of land, six to twelve feet in width, upon which the officers entered was between the driveway of the apartment-hotel and Loren-

---

open to view; to 'shadow' a person; or to station one's self near enough to overhear his conversations in public places . . . are all permissible under the civil and criminal laws of most jurisdictions. They are traditional police practices . . . . [U]nless the principle of the *Katz* case [*Katz* v. *United States, supra,* 389 U.S. 347] is extended to improbable and unwarranted lengths these actions involve no violation of Fourth Amendment rights.[2]" Footnote [2] cited, among other cases, *People* v. *Berutko, supra,* 71 Cal.2d 84, and *State* v. *Smith, supra,* 181 A.2d 761. In *Smith,* wherein the officer's observation was from a common hallway of a three-family house into an apartment through the keyhole or a crack in the molding of the door, it was held the observation was not a search.

[8]The majority opinion in *Mann,* "assume without deciding that the officers violated petitioners' constitutional right to privacy by looking through the windows while trespassing in the shrubbery outside."

zana's house. No fence separated that strip from that driveway, nor was there a fence on the north of the property or, so far as appears, elsewhere on the property. There was "dirt" or "dirt and grass" on the strip, and "dirt" was below the window through which the officers looked. No bushes were by that window. A second house was behind Lorenzana's house on the same lot, and from a diagram of the premises introduced by the defense and the description of the premises heretofore summarized, the superior court reasonably could have inferred that the strip constituted a normal access route both to Lorenzana's back door and to the back house on the same lot.[9] The window through which the officers looked was only five feet from the ground, and the apertures below and on the sides of the blinds permitted any adult of average height who walked by the window in immediate proximity thereto to see inside and overhear the conversation therein. Under the circumstances here appearing, in my opinion the superior court was warranted in finding impliedly that any expectation of privacy as to matters that could be observed or overheard from the strip of land outside the window was unreasonable.

This is not a case where the officer's observations were made from a trellis through a narrow aperture in the curtains into a motel room that was on the second floor and "at a considerable distance from any public vantage point" (*Pate* v. *Municipal Court,* 11 Cal.App.3d 721 [89 Cal. Rptr. 893]), or from a narrow outside ledge between two floors of a hotel through an aperture made by the blinds into a hotel room (*People* v. *Myles,* 6 Cal.App.3d 788, 790-791 [86 Cal.Rptr. 274]), or from a fire escape outside a fourth floor apartment (*Cohen* v. *Superior Court,* 5 Cal. App.3d 429, 434-435 [85 Cal.Rptr. 354]).

This case also differs from *People* v. *Cagle, supra,* 21 Cal.App.3d 57. There the appellate court sustained the trial court's finding that the officers violated the Fourth Amendment by looking into a bathroom window "at the rear of the house, situated far from all normal access routes." Here, the trial court impliedly found that the Fourth Amendment was not violated and, unlike *Cagle,* among other things, the window was only a few feet from the driveway of an apartment-hotel and was not "far from all normal access routes."

This case also differs from *People* v. *Edwards, supra,* 71 Cal.2d 1096, which held that the discovery of marijuana by officers in a trash can constituted an unreasonable search. The trash can was in "an open backyard area" near the back door of defendants' house, and the marijuana was not visible without rummaging in the receptacle. Here, as in *People* v.

---

[9] A claim by the majority that the evidence rebuts such an inference is discussed hereinafter.

*Sirhan,* supra, 7 Cal.3d 710, and unlike *Edwards,* the officers made their observations without moving any object.

I cannot agree with the majority's assertion that the evidence rebuts an inference that the six- to twelve-foot strip served as a normal access route both to the rear door of Lorenzana's residence and to the back house on the same lot. In support of that assertion, the majority states, "First, that evidence shows that there are bushes toward the rear of the house on the east side containing the window. Although the extent of obstruction is not revealed, it is reasonable to conclude that these bushes represent a significant hindrance to anyone proceeding to the rear of the house by way of this strip of land only six feet wide." The facts as related in the testimony of Officer Myers are set forth below,[10] and from that testimony the superior court reasonably could have made a finding contrary to the quoted conclusion of the majority.

"Second," states the majority, "the rear door of the Lorenzana home is situated on the west side of a vestibule protruding out of the rear of the structure. Since the door faces west and in fact is not even visible from the east, it would be unreasonable to infer that someone normally approaching the rear door would proceed down the east side past the window, clear around the vestibule, and finally to the door rather than proceeding by the more direct route down the west side of the house past the main entrance." It is absurd to assume that "the more direct route" to the rear door is down the west, rather than east, side of the house. Obviously which is a more direct route depends upon whether the person is coming from a location east or west of the house. As heretofore appears, the rear door was in about the middle of the back of the house.

The majority further claims that an inference that the strip in question served as a normal access route to the back house on the same lot as the Lorenzana house "is weakened by the existence of an alley on the south side of the [back] house, making it unreasonable to eschew access by way of that alley and choose instead access by passing from the street some 100 feet away and down the east side of the Lorenzana home." I submit it is illogical to assume that the only reasonable access route is by way of the alley.

Also, states the majority, Officer Myers' testimony undercuts an inference that access to the back house would be by way of the strip. The examination of Officer Myers included the following: "Q. The dirt you

---

[10]"Q. . . . What . . . is in that area [between the west of the apartment house driveway and the Lorenzana house]? A. . . . . I believe toward the rear of the house there is . . . three bushes about three feet away from the house."

were standing on [when looking into the window] was not a common use portion with other buildings, or with other residences other than 368 North Avenue 53, was it? A. Well, I don't know how to answer that, Counsel. I don't know if the land is owned by this house or by the apartment building, but just looking at it, from my own experience, I would say the land is probably owned by the person who owns this residence. [Counsel] Referring to 368 . . . THE WITNESS: Yes. BY [defense counsel]: So, then according to your observation, it was not a common use portion with other buildings, or with other residences, was it? A. No." By his final response the officer evidently meant that the land did not appear to be subject to general use by all the apartment house occupants rather than that the land did not appear to constitute an access route to the back house on the same lot. The mere fact that the land was probably owned by the owner of "368" obviously would not negate its being used as an access route to the back house on the same lot, and the ownership of the land appears to have been the matter upon which the officer based his conclusion that the land was "not a common use portion with other buildings."

Finally, the fact that the evidence does not establish whether a path had been constructed on the strip of land did not preclude an inference that the strip served as an access route to the rear door of Lorenzana's house and to the back house on the same lot since an access route is not confined to a formal path, and the majority does not assert otherwise.

The majority apparently orders the contraband found inside the residences suppressed solely on the ground that it was the fruit of the police conduct outside the window which conduct the majority holds constituted an unlawful search, but, I submit, the trial court properly held that such conduct did not constitute an unlawful search. That holding by the trier of fact, supported by substantial evidence, should not be disturbed by this court. The contraband found inside the residences should not be suppressed.

I would deny the petitions for mandamus.

McComb, J., concurred.

The petition of the real party in interest for a rehearing was denied July 18, 1973. Burke, J., and Clark, J., were of the opinion that the petition should be granted.