The STATE of Ohio, Appellee,

v.

LITTLE et al., Appellants.

[Cite as *State v. Little*, 183 Ohio App.3d 680, 2009-Ohio-4403.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 2008 CA 18.

Decided Aug. 28, 2009.

682

Anthony E. Kendell, Assistant Prosecuting Attorney, for appellee.

John J. Scacia, for appellants.

_____

DONOVAN, Presiding Judge.

{¶ 1} Defendant-appellants Gerald and Peggy Little appeal from their convictions and sentences for one count of trafficking in drugs, in violation of R.C. 2925.03(A)(1)(C)(3)(d), a felony of the third degree; and one count of cultivation of marijuana, in violation of R.C. 2925.04(A)(C)(5)(e), a felony of the third degree. Gerald Little additionally appeals his conviction and sentence for one count of tampering with evidence, in violation of R.C. 2921.12(A)(1), also a felony of the third degree.

{¶ 2} On September 26, 2007, appellants were each indicted for one count of trafficking in drugs and one count of cultivation of marijuana, while Gerald was also indicted for one count of tampering with evidence. Appellants were arraigned on October 12, 2007, and entered pleas of not guilty to all of the charges in the indictment.

{¶ 3} Appellants filed a motion to suppress any incriminating statements made to police, as well as any physical evidence seized during the search of their property on January 10, 2008. A hearing was held on the motion on April 11, 2008. On April 18, 2008, the trial court issued its decision in which it partially overruled and partially sustained appellants' motion to suppress.

{¶ 4} In return for the state's recommendation of community control, no jail time, and the grant of occupational driving privileges, appellants pleaded no contest to all of the charges against them on April 23, 2008. On May 28, 2008, the trial court issued an order of forfeiture regarding the residence and real property owned by appellants. The trial court did not follow the recommendation made by the state for community control and instead sentenced both appellants to one year in prison on June 4, 2008. In particular, the trial court found that neither of the appellants were amenable to community control based on prior minor traffic offenses. On June 18, 2008, the forfeiture proceeding and appellants' jail sentences were stayed pending the outcome of an appeal. Appellants filed a timely notice of appeal with this court on June 26, 2008.

I

{¶ 5} Once a year during the summer months, agents from the Ohio Bureau of Investigation and Identification ("BCI") team up with local law enforcement in a joint effort to find and dispose of marijuana growing throughout a particular county in Ohio. The joint effort, called "eradication," consists of an aerial support unit in a helicopter that travels across the county in an attempt to locate marijuana plants. When the aerial unit observes what it believes to be marijuana, it alerts a ground unit who is subsequently dispatched to the area where the contraband is located.

{¶ 6} On August 2, 2007, agents from BCI were working with deputies from the Miami County Sheriff's Office to find and "eradicate" any marijuana growing in Miami County, Ohio. In the early afternoon on the day in question, the aerial surveillance unit was flying over portions of Miami County at an altitude of between 500 to 600 feet when Special Agent Dwight Lee Aspacher, the spotter in the helicopter, observed what he believed to be multiple marijuana plants growing near an outbuilding on a piece of residential property. Agent Aspacher informed the pilot of the helicopter of what he observed, and the pilot flew back to the area and brought the helicopter down to the treeline, an altitude of approximately 100 feet, in order to confirm whether the plants were actually marijuana. Agent Aspacher testified that from the lower altitude, he observed two marijuana plants growing near the rear of the property, as well as two more marijuana plants growing near a dilapidated barn on the property.

{¶ 7} Agent Aspacher also testified that he observed a male and female standing on the back porch of the house located on the property before he ordered the pilot to momentarily leave the property to find street signs indicating the location of the residence. Agent Aspacher identified the general location of the residence from the helicopter's vantage point and relayed the information to the ground unit. Agent Aspacher ordered the helicopter back to the residence until the ground unit arrived. When the helicopter returned to the area where he initially observed the contraband, Agent Aspacher testified that it appeared as though one of the two marijuana plants near the dilapidated barn had been removed. Agent Aspacher circled the property in the helicopter until a ground unit arrived and secured the location.

{¶ 8} The subject property, located at 6155 Karns Road in West Milton, was owned by appellants. Officer Charlie Stiegelmeyer, a special agent supervisor from the Ohio Attorney General's Office, was a member of the ground unit who first arrived at appellants' residence. Officer Stiegelmeyer immediately walked to the back of the of the property where Agent Aspacher observed the marijuana plants. As he approached the dilapidated barn described by Agent Aspacher, Officer Stiegelmeyer came into contact with Gerald Little, who was walking out of

the barn holding pruning shears. With his gun drawn, Officer Stiegelmeyer instructed Gerald to drop the shears and walk towards him. Gerald, who appeared very nervous, did as he was instructed. Officer Stiegelmeyer testified that he observed a marijuana plant that had recently been cut down and was lying near the area where he first encountered Gerald.

{¶ 9} While Officer Stiegelmeyer detained Gerald, Deputy Jason Moore from the Miami County Sheriff's Office, who was also a member of the ground unit, testified that he smelled the strong odor of raw marijuana as he approached the front porch of the house on the property. Deputy Moore testified that he knocked on the door to the house, but no one came to the door. As he walked around the side of the house, Deputy Moore testified that he again smelled the strong odor of raw marijuana near an A/C window unit attached to the house. Deputy Moore proceeded towards the rear of the property, where he encountered Officer Stiegelmeyer and other deputies and agents who had detained Gerald. When he reached the area, Deputy Moore testified that he immediately noticed a tall marijuana plant that had been recently cut down. Because Gerald was sweating profusely, Deputy Moore transported him to shaded area near the barn. At this point, Deputy Moore testified that Gerald stated, "I only had a few plants. It's legal in some states. I'm sorry, please just take the plants and go." Once in the shaded area, Deputy Moore patted down Gerald for weapons, but found none.

{¶ 10} Deputy Moore testified that after he secured Gerald, he contacted his supervisor, Lieutenant Steve Lord, regarding securing a warrant to search the Littles' house. Lt. Lord told Deputy Moore to ask Gerald for consent to search the house. Deputy Moore testified that he asked, but Gerald refused to give his consent to search the house. Deputy Moore placed Gerald under arrest and read him his *Miranda* warnings. After Gerald was arrested, Deputy Moore sought and was eventually granted a warrant to search appellants' house on the basis of the plants discovered in the rear of the property, as well as the odor of marijuana emanating from inside the house. Once inside the house, the officers and agents found more marijuana plants, drug paraphernalia, and other items associated with the cultivation and sale of marijuana scattered throughout the house. The officers also discovered an extensive hydroponic marijuana-growing operation that took up an entire room in the house.

{¶ 11} As stated previously, the trial court sustained in part and overruled in part appellants' motion to suppress statements made by Gerald, as well as physical evidence retrieved from appellants' house. Ultimately, appellants pleaded no contest to the charges against them, and they were sentenced accordingly.

## II

{¶ 12} Appellants' first assignment of error is as follows:

{¶ 13} "The trial court erred in denying defendants' motion to suppress evidence gathered in violation of the 4th Amendment."

{¶ 14} In their first assignment, appellants contend that the trial court erred when it found that appellants did not have a reasonable expectation of privacy in the area near the barn behind appellants' residence where the marijuana plants were initially discovered. Appellants also argue that the aerial observation of their property was unconstitutional, since Special Agent Aspacher's observations took place from an unlawful vantage point. Specifically, appellants point out that their property was within five miles of Dayton International Airport, and Federal Aviation Administration regulations prohibit aerial incursions into the protected airspace without special permission. Therefore, appellants assert, the marijuana plants were not in "plain view" as concluded by the trial court, and the officers were required to secure a warrant before searching appellants' property through the use of a helicopter.

{¶ 15} Initially, we note that a review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71. When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. Id. With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must decide whether the facts satisfy the applicable legal standard. Id.

{¶ 16} It is fundamental that searches conducted outside the judicial process, without a warrant, are per se unreasonable, subject to a few specifically established and well-delineated exceptions. *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. The burden is on those seeking an exemption from the constitutional process to show the need for it. It is undisputed that the officers flew over and observed appellants' residence without a search warrant and, therefore, the state bore the burden of establishing that the warrantless search fell within an exception to the Fourth Amendment warrant requirement. *Athens v. Wolf* (1974), 38 Ohio St.2d 237, 67 O.O.2d 317, 313 N.E.2d 405.

{¶ 17} The state, for its part, argues that the officers were free to inspect appellants' residence from the aerial vantage point of the helicopter flying in public airspace. Thus, the state argues that the officers' aerial observations were made in plain view and gave them grounds to conduct an immediate search of appellants' property in order to investigate the marijuana growing on the property.

{¶ 18} Analysis of Fourth Amendment law is primarily focused upon whether a person has a "constitutionally protected reasonable expectation of

privacy." *Katz,* 389 U.S. at 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (Harlan, J., concurring). "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation is one that society is prepared to recognize as 'reasonable.' " Id. at 361, 88 S.Ct. 507, 19 L.Ed.2d 576. "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' " *Oliver v. United States* (1984), 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214, quoting *Boyd v. United States* (1886), 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746. The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened. *State v. Jones,* Lucas App. Nos. L–00–1231, L–00–1232, and L–00–1233, 2003-Ohio-219, 2003 WL 139762. In some instances, however, the curtilage of an area of a residence may not be protected when that area is open to public view. *State v. Staton* (Mar. 15, 1991), Greene App. No. 90–CA–62, 1991 WL 35224.

{¶ 19} Appellants argue that the area behind their home in which the marijuana was initially observed was within the curtilage of their residence, and therefore, subject to a heightened privacy expectation. In support of their argument, appellants point out that they took multiple measures to shield their property from public view. In particular, appellants had a fence surrounding the entire property and gates at the entrance to the property. There were also "no trespassing" signs scattered around the property. The dilapidated barn was located only 60 to 70 feet from the main residence. Additionally, the entire property, with the exception of the manicured area directly behind the residence, was covered in overgrown vegetation. These factors clearly evince a subjective intent on the part of appellants to maintain privacy on their property.

{¶ 20} "[O]bservations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense. On the other hand, when observations are made from a position to which the officer has not been expressly or implicitly invited, the intrusion is unlawful * * *." *State v. Peterson,* 173 Ohio App.3d 575, 2007-Ohio-5667, 879 N.E.2d 806, citing *Lorenzana v. Superior Court* (1973), 9 Cal.3d 626, 634, 108 Cal.Rptr. 585, 511 P.2d 33.

{¶ 21} In *California v. Ciraolo* (1986), 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210, the U.S. Supreme Court analyzed "whether naked-eye observation of the [defendant's] curtilage by police from an aircraft lawfully operating at an altitude of 1,000 feet violates an expectation of privacy that is reasonable." The court found that the defendant's construction of tall fences around his yard "met the test of manifesting his own subjective intent and desire to maintain privacy."

Id. at 211–214, 106 S.Ct. 1809, 90 L.Ed.2d 210. The court further found, however, that the defendant could not reasonably have expected that his garden was protected from public or official inspection from the air. Id. According to the *Ciraolo* court, public airways were similar to public highways and "the mere fact that an individual has taken measures to restrict some views of his activities" does not "preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." Id.

{¶ 22} In *Florida v. Riley* (1989), 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (plurality opinion), the court examined whether helicopter surveillance from an altitude of 400 feet, which revealed marijuana growing in the defendant's partially covered greenhouse, constituted a search requiring a warrant. In a sharply divided split decision, the plurality concluded that the surveillance was not a "search" for Fourth Amendment purposes, noting specifically that there is no lower limit of the navigable airspace allowed to helicopters and that flight by helicopters in public airways is routine. Id. "Any member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have observed Riley's greenhouse." Id. at 451, 109 S.Ct. 693, 102 L.Ed.2d 835.

{¶ 23} The plurality also noted that although the defendant had shielded his marijuana from view at ground level, because the roof was left partially open, the marijuana growing inside was subject to viewing from an aerial vantage point. Id. Thus, the defendant could not reasonably have expected the partially hidden contraband to be immune from being viewed from the air. Id.

{¶ 24} The *Riley* plurality also stated, however, that "it [was] of obvious importance that the helicopter in this case was not violating the law." Id. Presumably, the court would have found that a helicopter was "violating the law" if it had flown at an unsafe altitude in violation of FAA regulations or otherwise interfered with the defendant's normal use of his property or other parts of the curtilage.

{¶ 25} In the instant case, appellants point out that their property was located within five miles of Dayton International Airport. Thus, the airway over appellants' property is Class C airspace tightly governed by FAA regulations and is essentially a "no-fly" zone unless one has special permission from air traffic control to fly in that area. Thus, the airway is not for public use, and appellants would, therefore, not reasonably expect helicopters or other aircraft to routinely fly over their property.

{¶ 26} The FAA regulations cited by appellants, Sections 91.123, 91.130, 91.173, and 91.119, Title 14, C.F.R., establish compliance with ATC clearances, operations in Class C airspace, ATC clearance and flight plan requirements, and the general

provisions for minimum safe altitudes. Specifically, appellants point out the regulation found in Section 91.130(c) and (c)(1), Title 14, C.F.R., which was admitted into evidence by the trial court at the suppression hearing and states:

{¶ 27} "(c) Communications. Each person operating an aircraft in Class C airspace must meet the following two-way radio communications requirements:

{¶ 28} "(1) Arrival or through flight. Each person must establish two-way radio communications with the ATC facility (including foreign ATC in the case of foreign airspace designated in the United States) providing air traffic services prior to entering that airspace and thereafter maintain those communications while within that airspace."

{¶ 29} In its decision partially overruling appellants' motion to suppress, the trial court held that because the helicopter in the instant case was stationed at a higher altitude than the helicopter in *Riley* (400 feet) and the marijuana was "in open and plain sight from the air," appellants had no reasonable expectation of privacy. With respect to the officers' alleged violation of the FAA regulations regarding staying in contact with the ATC at Dayton International Airport, the court further stated "whether or not the helicopter pilot was in proper contact with the airport air controllers has no bearing on the Defendants' reasonable expectation of privacy. Even if it did, the evidence shows that the helicopter pilot was in radio contact with the airport."

{¶ 30} We first note that the testimony adduced at the hearing established that Special Agent Aspacher thought that he saw what appeared to be marijuana plants from an initial altitude of 500 to 600 feet with his unaided eye. Aspacher further testified, however, that he ordered the pilot to bring the helicopter down to the tree-line or approximately 100 feet in order to confirm whether the plants he saw were actually marijuana.

{¶ 31} More important, however, we disagree with the trial court's conclusion that the pilot's compliance with FAA regulations had no bearing on the defendant's reasonable expectation of privacy. If the pilot was not in compliance with FAA regulations, then he was unlawfully flying the helicopter in an a privately controlled area without the necessary permission. The airway over appellants' property was not publicly navigable airspace, and the helicopter pilot was required to inform the ATC at Dayton International Airport of his intention to fly in that area, as well as maintain contact with the ATC while flying in the restricted airspace. Appellants, therefore, did have a reasonable expectation of privacy from aerial surveillance of their property since they lived under restricted airspace governed by FAA regulations.

{¶ 32} Additionally, the trial court's finding that the evidence demonstrated that the helicopter pilot was in radio contact with the airport was not

supported by the record. Special Agent Aspacher provided the following testimony during cross-examination at the hearing:

{¶ 33} "Q: Now when you were in the cockpit were you able to hear what the pilot was saying or what the pilot was doing? Were you able to see what he was doing and hear what he was saying?

{¶ 34} "A: Yeah.

{¶ 35} "Q: Now you were coming from the South, correct?

{¶ 36} "A: Yeah, I believe we came from the Southwest, yeah. We came from the Southwest.

{¶ 37} "Q: And the vicinity, do you know where the Dayton International Airport is?

{¶ 38} "A: Yes, sir.

{¶ 39} "Q: And where approximately was that?

{¶ 40} "A: That was gonna be to the South and West of our location.

{¶ 41} "Q: From where the house was?

{¶ 42} "A: That's correct. Maybe a little more to the West.

{¶ 43} "Q: But you were coming from that general direction?

{¶ 44} "A: We were coming from West Milton.

{¶ 45} "Q: Do you—did you hear the pilot talking at all to anybody on the radio, like Dayton international Airport?

{¶ 46} "A: At that point, no, I did not.

{¶ 47} "Q: All right. At any point did you?

{¶ 48} "A: He talks to 'em on occasion when we're in their airspace and *he could have radioed them to let them know that we're gonna be orbiting that area because we had spotted some marijuana.* He will let them know that we'll probably be off their radar, because we go lower when we're orbiting. *Did I hear him call at that point, I can't a hundred percent say that because I have to switch over to talk to the ground units.*

{¶ 49} "Q: All right. So you don't know whether he was talking to the airport or not during this time, correct?

{¶ 50} "A: *He could have been while I was talking to the ground units.*

{¶ 51} "Q: But you haven't heard one way or the other from 'em?

{¶ 52} "A: I can't say I have for sure.

{¶ 53} "Q: All right. And you would agree with me you were in the Dayton International airspace, correct?

{¶ 54} "A: Yes." (Emphasis added.)

{¶ 55} Based on the preceding exchange, the record does not demonstrate that the helicopter pilot was ever in contact with the ATC at the Dayton International Airport. The pilot of the helicopter, Gary Drummer, did not testify at the hearing. Special Agent Aspacher's testimony, other than establishing that he knew the helicopter was flying in restricted airspace, did not affirmatively establish that the pilot followed the FAA regulations by maintaining contact with the airport. Thus, the state failed to meet its burden to demonstrate that the helicopter was in a lawful vantage point when Special Agent Aspacher observed the marijuana plants next to the barn in appellants' backyard. Since the helicopter was illegally in restricted airspace when it viewed the contraband on appellants' property, the surveillance invaded a constitutionally protected legitimate expectation of privacy held by appellants in regard to their property. The trial court erred when it overruled appellants' motion to suppress in this regard.

{¶ 56} The aerial surveillance in this case was a warrantless search forbidden by the Fourth Amendment. The warrant authorizing the subsequent search of appellants' residence was obtained in large part on the basis of the aerial search. Thus, the evidence seized as a result of the initial warrantless aerial search and ground search, as well as the evidence discovered upon execution of the search warrant, should have been excluded. In the future, law-enforcement agencies should take precautions to avoid the violation of FAA regulations when performing aerial surveillance of rural properties in order to ensure that they are acting within the confines of the Fourth Amendment.

{¶ 57} Appellants' first assignment of error is sustained.

## III

{¶ 58} Appellants' second assignment of error is as follows:

{¶ 59} "The trial court committed prejudicial error in denying defendants' motion to suppress evidence gathered in violation of the 5th Amendment and Section 10, Article I of the Ohio Constitution."

{¶ 60} Although the trial court correctly found some of Gerald's incriminating statements to be voluntary, the statements were made as a consequence of the officers' initial illegal aerial surveillance of appellants' property. Thus, the statements were "fruit of the poisonous tree" and should have also been suppressed. *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

{¶ 61} Appellants' second assignment is sustained.

## IV

{¶ 62} Appellants' remaining assignments of error are as follows:

{¶ 63} "Forfeiture of defendants' property violated the 8th Amendment because it is grossly disproportionate to the seriousness of the offense.

{¶ 64} "The amendment of the forfeiture indictment was improper.

{¶ 65} "The trial court abused its discretion in denying defendants' motion to withdraw the no contest plea when it found that defendant had not established manifest injustice.

{¶ 66} "The trial court erred in finding a substantial basis for probable cause in the search warrant."

{¶ 67} In light of our disposition with respect to appellants' first assignment of error, the remaining assignments are rendered moot.

## V

{¶ 68} Appellants' first and second assignments of error having been sustained, the judgment of the trial court is reversed, and this cause is remanded for proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

FAIN, J., concurs.

GRADY, J., dissents.

FAIN, Judge, concurring.

{¶ 69} I write separately merely to explain why I have not found the Littles' failure to have complied with the requirements of *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 524 N.E.2d 889, to be fatal to their position on appeal.

{¶ 70} The Littles did raise the issue of the unlawfulness of the police officers in the helicopter having been in the position where they could observe the marijuana during the hearing. The state could have objected to the raising of that issue, upon the grounds of lack of notice under *Xenia v. Wallace,* but did not do so. Had the state objected, the trial court's discretion would not have been limited, in my view, to a refusal to consider that argument. In my view, the trial court would have had discretion to permit the Littles, in the interest of justice, to amend their motion to include their objection to the evidence upon the ground that it was not observed in plain view, due to the failure of the police officers having observed it to have been lawfully in a position to observe it. If the state could then have established that the state's lack of notice that this issue was

going to be raised at the hearing had prejudiced the state, the trial court would have had the further discretion to permit a continuance of the hearing to a later day, when the state could have presented additional evidence, and legal authorities, on this issue.

{¶ 71} The failure of the state to have raised the issue of a waiver under *Xenia v. Wallace,* either in the trial court or in this court, has effectively sandbagged the Littles by having made it impossible for them to invoke the discretion of the trial court to fashion a remedy that would have protected the rights of both parties.

{¶ 72} Had the Littles failed to raise, at the hearing in the trial court, the issue of the unlawfulness of the police officers' observation of the marijuana growing on their property, I would reach a different conclusion. But they did raise that issue, albeit near the end of the hearing, and the state had an opportunity to object to the trial court's considering it, but did not do so. In fact, the trial court did consider that issue, without objection by the state. In my view, the trial court reached an incorrect result on that point, which was tried by the trial court without objection by the state.

{¶ 73} In my view, it is too late now to affirm the judgment of the trial court upon the basis that if the state had objected to consideration of the issue, then the trial court could have, in its discretion, declined to consider it. In my view, the propriety of a judgment of a trial court must be based upon what actually happened in the trial court, not what might have happened.

GRADY, Judge, dissenting.

{¶ 74} I respectfully dissent from the majority's decision sustaining the first assignment of error.

{¶ 75} The written motion to suppress evidence that defendants filed alleged that observations officers made while "flying in a helicopter above the [defendants'] property at an altitude of about 50 feet * * * constitute a warrantless search in this instance," citing *Florida v. Riley* (1989), 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835. The state disputed the foundational claim that the defendants had a reasonable expectation of privacy that could be violated, and the trial court agreed. On appeal, defendants argue that the trial court erred because the record demonstrates that the state's agents were subject to an FAA regulation governing flights within a prescribed distance of a commercial airport that created a reasonable expectation of privacy, which the court should have found was violated absent evidence showing compliance with the regulation.

{¶ 76} The motion to suppress evidence that defendants filed is wholly devoid of any reference to the FAA regulation or failure to comply with it. Neither did

defendants move to amend their written motion prior to the hearing on it to give the prosecutor and the court notice of defendants' claim regarding the regulation. No mention of the regulation was made at all prior to or during the evidentiary hearing. The evidence the majority finds insufficient to demonstrate compliance with the regulation was brought out not by the prosecutor, but by counsel for defendants in his cross-examination of the state's witness and direct examination of his own.

{¶ 77} The first reference of any kind to the FAA regulation was by counsel for defendants when, after the close of evidence at the hearing on the motion to suppress, he orally requested the court to take judicial notice of the FAA regulation, arguing that because the evidence he had offered suggested a failure to comply with the regulation, and absent any showing of compliance by the state, the record could not support a finding by the court that officers were legally in a position to observe marijuana growing on defendants' property from the helicopter.

{¶ 78} The prosecutor twice objected to the defendants' request to take judicial notice of the FAA regulation. The court allowed the parties seven days in which to file memoranda of their arguments on the matter. The transcript was filed six days after the hearing, and on that same date both parties moved for extensions of time within which to file their memoranda. The court didn't address those requests, and on the following day, it filed its written decision that rejected defendants' argument, stating that "[w]hether or not the helicopter pilot was in proper contact with the airport has no bearing on Defendants' reasonable expectation of privacy. Even if it did, the evidence shows that the helicopter pilot was in radio contact with the airport."

{¶ 79} Defendants argue on appeal that because the record fails to contain evidence demonstrating compliance with the FAA regulation, the trial court erred in the finding it made. The majority agrees and reverses defendants' convictions on a finding that their motion to suppress should therefore have been granted.

{¶ 80} Motions to suppress evidence "must be raised before trial," Crim.R. 12(C)(3), and unless the court permits the motion to be made orally, the motion "shall be in writing [and] state with particularity the grounds on which it is made." Crim.R. 47; *State v. Shindler* (1994), 70 Ohio St.3d 54, 636 N.E.2d 319. When that burden is satisfied in a case involving a warrantless search, an evidentiary burden is then imposed on the prosecutor to offer evidence rebutting the grounds for relief alleged. To trigger the prosecutor's burden, the motion must raise the specific legal and factual grounds for challenging the legality of the warrantless search, because "the prosecutor must know the grounds of the challenge in order to prepare his case, and the court must know of the grounds of the challenge in order to rule on the evidentiary issues at the hearing and

properly dispose of the merits." *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 218, 524 N.E.2d 889. "Failure on the part of the defendant to adequately raise the basis of his challenge constitutes a waiver of that issue on appeal." Id.

{¶ 81} Defendants' failure to raise the issue of the FAA regulation and compliance with it in any way in the Crim.R. 12(C)(3) motion to suppress they filed waives their right to argue on appeal that the trial court erred when it found compliance with the regulation. The majority ignores defendants' waiver and finds that suppression was warranted because the state failed to meet its burden to offer evidence demonstrating compliance with the FAA regulation. However, as *Xenia v. Wallace* noted, when there is a failure of notice on the part of the defendant "the prosecutor cannot be expected to anticipate the specific legal and factual grounds upon which the defendant challenges the legality of a warrantless search." Id. at 218, 524 N.E.2d 889.

{¶ 82} Defendants' argument relying on *Florida v. Riley*, which is quoted above, cannot reasonably be read to have put the prosecutor on notice of the specific legal and factual grounds that the FAA regulation and the need to comply with it would involve. As a result, defendants' right to assign error on appeal with respect to that issue is waived, absolutely and as a matter of law. *Xenia v. Wallace.* To suggest that defendants are relieved of their waiver by the prosecutor's failure to make a specific *Xenia v. Wallace* objection turns the Supreme Court's holding in that case on its head. That outcome isn't avoided by speculating about what might have happened had the prosecutor objected.

{¶ 83} The requirements imposed on defendants by Crim.R. 12(C)(3) and 47, and the holding in *Xenia v. Wallace*, 37 Ohio St.3d 216, 524 N.E.2d 889, are intended to avoid the kind of sandbagging that occurred in the present case. Defendants obviously intended to rely on the FAA regulation when they came to the hearing, but they failed to give the court and the prosecutor prior notice of their intention. Indeed, defendants purposely waited until the evidentiary portion of the hearing was closed to ask the court to find that the evidence was insufficient to show compliance with the regulation. The prosecutor, being surprised, didn't specifically object to a failure of notice, arguing instead that judicial notice of the FAA regulation wasn't warranted.

{¶ 84} Rather than rejecting defendants' argument concerning the FAA regulation for lack of notice, as it should have, the trial court instead considered the FAA regulation and found that evidence of compliance with it was sufficient, though it wasn't. Now, seizing on the court's mistaken interpretation of the evidence, the majority ignores the defendants' waiver of their right to argue any error on appeal with respect to the regulation and finds that the state's failure to meet its burden required suppression. That is the kind of tunnel vision that the holding in *Xenia v. Wallace* was intended to avoid.

{¶ 85} Though it can't claim surprise at this stage of the proceedings, the state also fails to argue on appeal that defendants waived their right to rely on the FAA regulation. However, the fact that the state has been consistently asleep at the switch can't relieve defendants of the absolute waiver as a matter of law regarding the FAA regulation to which defendants are subject per *Xenia v. Wallace* due to their failure to provide notice. An appellee who defends a judgment doesn't forfeit a basis to affirm it merely because he fails to point it out.

{¶ 86} Appellate courts may decide an issue on grounds different from those determined by the trial court when the evidentiary basis on which the court of appeals decides a legal issue was adduced before the trial court and made a part of its record. *State v. Peagler* (1996), 76 Ohio St.3d 496, 668 N.E.2d 489. Defendants' failure to give notice of the grounds for suppression on which they would ask the court to rely is glaringly evident from the record. Our rejection of the trial court's finding that the FAA regulation was satisfied does not, and should not, relieve defendants of their waiver of that issue for their failure to comply with Crim.R. 12(B)(3) and 47, pursuant to the holding in *Xenia v. Wallace*.

{¶ 87} I would overrule the first assignment of error for waiver and proceed to decide the other errors assigned.