[Cite as *State v. Duvernay*, 2017-Ohio-4219.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,             CASE NO.  1-16-62

      v.

ANTHONY J. DUVERNAY,           O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR 2015 0418

**Judgment Affirmed**

**Date of Decision:    June 12, 2017**

APPEARANCES:

    *Jason N. Flower and Tabitha L. Stewart* **for Appellant**

    *Jana E. Emerick* **for Appellee**

**PRESTON, P.J.**

{¶1} Defendant-appellant, Anthony J. Duvernay ("Duvernay"), appeals the December 5, 2016 judgment entry of sentence of the Allen County Court of Common Pleas. He argues that the trial court erred in denying his motions to suppress evidence. For the reasons that follow, we affirm.

{¶2} This case stems from an investigation conducted by the Lima/Allen County Interdiction Task Force ("Task Force") of Duvernay and Duvernay's co-defendant, Marvin Thomas, Sr. ("Thomas"), for drug-related activity. The Task Force received multiple tips in the spring of 2015 that Thomas was engaging in drug-related activity, and, as a result, the Task Force obtained a search warrant for a GPS monitoring device for Thomas's vehicle. (Feb. 22, 2016 Tr. at 5). The Task Force also installed on May 29, 2015 a video camera on a utility pole—commonly referred to as a "pole camera"—located near Thomas's residence. (*Id.* at 5, 7). "[T]hrough the use of watching that camera," the Task Force suspected Duvernay was involved in the same drug-related activity as Thomas. (*Id.* at 6). Based on that suspicion, the Task Force began investigating Duvernay by obtaining search warrants on September 9 and 23, 2015 for GPS monitoring devices for Duvernay's vehicles and installing on October 6, 2015 a pole camera down the road from Duvernay's residence. (*Id.* at 6-7); (Apr. 11, 2016 Tr. at 37-38).

{¶3} On October 23, 2015, the Allen County Grand Jury indicted Duvernay on: Count One of possession of heroin in violation of R.C. 2925.11(A), (C)(6)(f), a first-degree felony, with a major drug offender ("MDO") specification under R.C. 2941.1410(A) and four automobile-forfeiture specifications under R.C. 2941.1417(A); Count Two of trafficking in heroin in violation of R.C. 2925.03(A)(2), (C)(6)(g), a first-degree felony, with a MDO specification under R.C. 2941.1410(A) and four automobile-forfeiture specifications under R.C. 2941.1417(A); Count Three of illegal manufacture of drugs in violation of R.C. 2925.04(A), (C)(2), (E), a second-degree felony, with a MDO specification under R.C. 2941.1410(A) and four automobile-forfeiture specifications under R.C. 2941.1417(A); and Count Four of engaging in a pattern of corrupt activing in violation of R.C. 2923.32(A)(1), (B)(1) and 2929.14(B)(3), a first-degree felony, with four automobile-forfeiture specifications under R.C. 2941.1417(A). (Doc. No. 1). On October 28, 2015, Duvernay pled not guilty to the counts and specifications of the indictment. (Doc. Nos. 8, 138).

{¶4} On January 8, 2016, Duvernay filed a motion to suppress evidence obtained from the October 15, 2015 search-warrant execution at Duvernay's residence. (Doc. No. 30). Specifically, Duvernay requested the suppression of that evidence because the evidence used to establish probable cause for the search warrant was obtained through an illegal, warrantless search—that is, Duvernay

argued that the installation and operation of the pole camera outside of Duvernay's residence violated his Fourth Amendment right to privacy. (*Id.*). On January 22, 2016, Duvernay filed a second motion to suppress evidence "obtained pursuant to a GPS search warrant[s]" because the search warrants issued for the GPS tracking devices were granted without sufficient evidence of probable cause. (Doc. No. 34). The State filed its response to Duvernay's first motion to suppress evidence on February 12, 2016. (Doc. No. 43). After a hearing on February 22, 2016, the trial court denied Duvernay's first motion to suppress evidence. (Doc. No. 44). After a hearing on April 11, 2016, the trial court denied Duvernay's second motion to suppress evidence. (Doc. No. 60).

{¶5} On December 2, 2016, Duvernay withdrew his pleas of not guilty and entered pleas of no contest to Count One of the original indictment, to an amended Count Four, and to the specifications. (Doc. No. 138). In exchange for his change of pleas, the State agreed to amend Count Four "to omit 2929.14(B)(3) allegation [sic] that the most serious offense in the pattern of corrupt activity was a felony of the first degree," dismiss Counts Two and Three, and enter a joint-sentencing recommendation. (Doc. No. 137). The trial court accepted Duvernay's pleas of no contest, found him guilty of the counts and the MDO specification, and proceeded to sentencing. (Doc. Nos. 138, 139). The trial court sentenced Duvernay to 11 years in prison on Count One and 7 years in prison on Count Four, and ordered that

Duvernay serve the terms consecutively for an aggregate sentence of 17 years. (Doc. No. 139). The trial court further ordered that Duvernay's "interest in each of the FOUR (4) vehicles listed on the indictment * * * forfeited." (*Id.*). The trial court filed its judgment entries of conviction and sentence on December 5, 2016. (Doc. Nos. 138, 139).

{¶6} Duvernay filed a notice of appeal on December 27, 2016. (Doc. No. 144). He raises two assignments of error for our review, which we discuss together.

**Assignment of Error No. I**

**The Common Pleas Court of Allen County, Ohio, Judge Reed, erred in overruling Appellant's, Anthony Duvernay's Motion to Suppress the evidence obtained from the pole camera placed by the Lima Police Department, to monitor Appellant's home.**

**Assignment of Error No. II**

**The Common Pleas Court of Allen County, Ohio, Judge Reed, erred in overruling Appellant, Anthony Duvernay's Motion to Suppress, as the evidence obtained from the GPS tracker placed on Appellant's vehicle, was fruit of the poisonous tree.**

{¶7} In his assignments of error, Duvernay argues that the trial court erred by denying his motions to suppress evidence. In his first assignment of error, Duvernay argues that, "[s]ince the Lima Police Department videotaped [Duvernay's] garage, an area that does fall within the curtilage of Appellant's home, the evidence obtained from the illegal search should be suppressed." (Appellant's Brief at 14). In his second assignment of error, Duvernay argues that there was

insufficient evidence of probable cause to issue the search warrants for the GPS tracking devices to be installed on his vehicles because it, in part, was based on information obtained from an illegal search—that is, Duvernay argues that "[p]olice used the illegally obtained evidence from the pole camera to get a court approved search warrant for the GPS tracker." (Appellant's Brief at 15).

{¶8} A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶9} "The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, and Ohio Constitution, Article I, Section 14, protects individuals against 'unreasonable searches and seizures' by the government and protects privacy interests where an individual has a reasonable

expectation of privacy." *State v. Fielding*, 10th Dist. Franklin Nos. 13AP-654 and 13AP-655, 2014-Ohio-3105, ¶ 15, quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577 (1979). *See also State v. Steinbrunner*, 3d Dist. Auglaize No. 2-11-27, 2012-Ohio-2358, ¶ 12. "An expectation of privacy is protected by the Fourth Amendment where (1) an individual has exhibited a subjective expectation of privacy, and (2) that expectation of privacy is one that 'society is prepared to recognize as "reasonable.""" *Fielding* at ¶ 15, quoting *Smith* at 740, quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507 (1967) (Harlan, J., concurring). "Generally, any evidence obtained in violation of the Fourth Amendment, as well as any evidence seized subsequent to such violation, must be suppressed as 'fruit of the poisonous tree.'" *Id.*, quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407 (1963). *See also State v. Jenkins*, 3d Dist. Union No. 14-10-10, 2010-Ohio-5943, ¶ 9 (The Fourth Amendment does not explicitly provide "that violations of its provisions against unlawful searches and seizures will result in the suppression of evidence obtained as a result of such violation, but the United States Supreme Court has held that the exclusion of evidence is an essential part of the Fourth Amendment."), citing *Mapp v. Ohio*, 367 U.S. 643, 649, 81 S.Ct. 1684 (1961) and *Weeks v. United States*, 232 U.S. 383, 394, 34 S.Ct. 341 (1914).

{¶10} Under his first assignment of error, Duvernay argues that the pole camera was installed without a warrant and not pursuant to any exception to the

warrant requirement of the Fourth Amendment. In particular, he argues that an attached garage located on Duvernay's property falls within the curtilage of his residence and, as such, is not subject to a search without a warrant. In other words, Duvernay argues that the surveillance footage obtained of the attached garage from the pole camera amounted to an illegal search. For that reason, Duvernay asserts law enforcement lacked probable cause for the search warrant issued on October 15, 2015, and evidence obtained under that search warrant should be suppressed.

{¶11} An individual's reasonable expectation of privacy extends to the "curtilage" of that individual's home. *State v. Helmbright*, 10th Dist. Franklin Nos. 11AP-1080 and 11AP-1081, 2013-Ohio-1143, ¶ 14, citing *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134 (1987). "The curtilage of a home is the area '"[s]o intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."'" *Id.*, quoting *State v. Payne*, 104 Ohio App.3d 364, 368 (12th Dist.1995), quoting *Dunn* at 301. "The central inquiry is 'whether the area harbors the "'intimate activity associated with the sanctity of a man's home and the privacies of life.'"'" *Id.*, quoting *Dunn* at 300, quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735 (1984), quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524 (1886). "In some instances, however, the curtilage of an area of a residence may not be protected when that area is open to public view." *State v. Little*, 183 Ohio App.3d 680, 2009-Ohio-4403, ¶ 18 (2d

Dist.), citing *State v. Staton*, 2d Dist. Greene No. 90-CA-62, 1991 WL 35224 (Mar. 15, 1991).

{¶12} The Sixth Circuit Court of Appeals addressed law enforcement's use of pole cameras under Fourth Amendment jurisprudence and concluded that law enforcement's use of pole cameras does not violate the Fourth Amendment because there is "no reasonable expectation of privacy in video footage recorded by a camera that [is] located on top of a public utility pole[, which] capture[s] the same views enjoyed by passersby on public roads." *United States v. Houston*, 813 F.3d 282, 287-288 (6th Cir.2016). *See also United States v. Anderson-Bagshaw*, 509 Fed.Appx. 396 (6th Cir.2012); *United States v. Wymer*, 654 Fed.Appx. 735 (6th Cir.2016). We see no reason to depart from the Sixth Circuit's reasoning. Based on that reasoning, we conclude that the trial court did not err by denying Duvernay's motion to suppress evidence obtained from the pole camera because the trial court's conclusion that Duvernay had no reasonable expectation of privacy in the images captured by the pole camera is supported by competent, credible evidence.

{¶13} In this case, the State offered the testimony of one witness at the February 22, 2016 suppression hearing—Investigator Jesse Harrod ("Harrod") of the Task Force. (Feb. 22, 2016 Tr. at 4). Harrod testified that law enforcement installed on October 6, 2015 a pole camera on a utility pole down the road from Duvernay's residence. (*Id.* at 6-7). Law enforcement monitored video-surveillance

footage obtained from the pole camera until October 15, 2015—the day Duvernay was arrested—and the pole camera was removed on October 27, 2015. (*Id.* at 7).

**{¶14}** The utility pole on which the pole camera was installed is property of American Electric Power ("AEP"). (*Id.* at 11). As such, law enforcement requested that AEP affix the pole camera to its utility pole, AEP agreed, and installed the pole camera. (*Id.*). The utility pole is located "on the other side of the neighbor's driveway" and the pole camera "recorded the south side of Mr. Duvernay's residence." (*Id.* at 15). The south side of Duvernay's residence includes "the driveway, the garage door [of an attached garage], [and] an angled view of the front of the house and a very small portion of the back yard." (*Id.* at 15-16). The pole camera also recorded the northbound portion of Schooler Road and the intersection of Schooler and Hanthorn Roads. (*Id.* at 16).

**{¶15}** Harrod testified that law enforcement could see "two to three feet into the garage" with the pole camera. (*Id.* at 17). According to Harrod, "Really the only thing you could see into the garage was, well, it looked like a cluttered mess with random boxes stacked up and maybe some shelving. But, you couldn't really see much beyond that." (*Id.*). Harrod testified that law enforcement could not view the back of the garage or any portion of Duvernay's residence. (*Id.* at 17, 19-20). Harrod further testified that law enforcement were unable to see into Duvernay's backyard by use of the pole camera. (*Id.* at 20).

{¶16} The pole camera provided law enforcement with "live" video surveillance, which could be viewed remotely. (*Id.* at 11). Law enforcement could remotely manipulate the pole camera to views to the left, right, up, and down, and could cause the camera to zoom in on an image. (*Id.* at 12). According to Harrod, footage from the pole camera was monitored "randomly" by law enforcement. (*Id.* at 13). Although the pole camera has a "zoom feature," law enforcement were "not able to get close enough to determine license plate numbers" and could "identify [only] people that [law enforcement were] aware of as part of this investigation, whether it be Mr. Duvernay or Mr. Thomas" based on the location of the pole camera. (*Id.* at 12). Law enforcement did not monitor or review nighttime footage because law enforcement "could not see much of anything through the camera after dark." (*Id.* at 15).

{¶17} Harrod testified that "everything that the camera was able to see could also be seen by anyone traveling on Schooler Road." (*Id.* at 20). According to Harrod, "Actually if you were driving on Schooler Road you would probably have a better view of the residence and into the garage than what we had from the pole camera." (*Id.* at 21). He also testified that "anyone traveling down Schooler Road, as well as Mr. Duvernay's neighbors, they would actually have a vantage point to view his residence and the same that the camera was surveilling from multiple vantage points." (*Id.*). Indeed, Duvernay's neighbors "would have a direct view

into the garage if the garage door was opened and would actually probably be able to see better into the garage" than the view that the pole camera was able to capture. (*Id.*).

{¶18} Harrod identified State's Exhibit 1 as "an aerial view of the area around [Duvernay's residence]." (*Id.* at 7). He identified State's Exhibit 2 as a photograph taken "from the south of Mr. Duvernay's residence" depicting the utility pole on which the pole camera was affixed. (*Id.* at 9). Harrod identified State's Exhibit 3 as a photograph taken from the driveway of the residence located "directly to the north of Mr. Duvernay's residence" depicting "the north side" of Duvernay's residence "along with the front, the east facing side of the house." (*Id.* at 10). Harrod identified State's Exhibit 8 as a photograph depicting the quality of footage captured by the pole camera at nighttime. (*Id.* at 13-14). He identified State's Exhibit 4 as a photograph depicting the "expanded view pre-setting [of the pole camera, which] would cover both [Duvernay's] driveway, right in front of the garage, and Schooler Road up to Hanthorn Road." (*Id.* at 16). Harrod identified State's Exhibit 5 as a photograph of "a zoomed in image that captures more of the driveway directly in front of the garage on the south side of the house and the garage area." (*Id.* at 17). He identified State's Exhibits 6 and 7 as photographs of

Duvernay's garage. (*Id.* at 17-19). Duvernay and Thomas can be seen in State's Exhibit 6. (*Id.* at 18-19).[1]

{¶19} On cross-examination, Harrod testified that the pole camera was installed on the utility pole at a level higher than "the normal human being." (*Id.* at 22-23). As such, Harrod agreed that the pole camera provided a "different perspective or different angle than a regular person on the road." (*Id.* at 23).

{¶20} On re-direct examination, Harrod testified that Duvernay did not "have any kind of privacy fencing around his house" or "attempt to shield it from anyone driving by on Schooler Road" or "any of the neighbors." (*Id.* at 27).

{¶21} Duvernay argues that the use of the pole camera violated his Fourth Amendment right to privacy because his garage is within the curtilage of his home, and he therefore has a reasonable expectation of privacy in that area. However, we need not address Duvernay's curtilage argument because, even if we assume without deciding that the area is curtilage, "the warrantless videos do not violate [Duvernay's] reasonable expectations of privacy, because [law enforcement] had a right to access the public utility pole and the camera captured only views that [are] plainly visible to any member of the public who drove down the roads bordering [Duvernay's residence]." *Houston*, 813 F.3d at 288, citing *United States v. Jackson*, 213 F.3d 1269, 1280-1281 (10th Cir.2000), *vacated on other grounds*, *Jackson v.*

---

[1] All of the State's Exhibits were admitted into evidence without objection. (*Id.* at 28-29).

*United States*, 531 U.S. 1033, 121 S.Ct. 621 (2000). *See also Anderson-Bagshaw*, 509 Fed.Appx. at 404 (concluding that, even assuming an area is curtilage, there is no Fourth Amendment violation for the warrantless observation of curtilage because "law enforcement officers are entitled to observe things in plain sight from publicly accessible areas."); *State v. Peterson*, 173 Ohio App.3d 575, 2007-Ohio-5667, ¶ 15 (2d Dist.) ("Even if property is within the curtilage, a visual inspection of that property from outside the curtilage does not constitute a search."), citing *United States v. Hatfield*, 333 F.3d 1189 (10th Cir.2003). In other words, even if an "'area is within the curtilage[, that] does not bar all police observation [because t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.'" *Anderson-Bagshaw* at 404, quoting *California v. Ciraolo*, 467 U.S. 207, 213, 106 S.Ct. 1809 (1986). Indeed, "[l]aw enforcement officers may observe a home's curtilage 'from a public vantage where [they] have a right to be and which renders the activities clearly visible.'" *Id.*, quoting *Ciraolo* at 213. *See also Little*, 2009-Ohio-4403, at ¶ 20 ("'[O]bservations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense.'"), quoting *Peterson* at ¶ 13, citing *Lorenzana v. Superior Court*, 9 Cal.3d 626, 634, 108 Cal.Rptr. 585, 511 P.2d 33 (1973).

**{¶22}** Harrod's testimony indicates that the images captured by the pole camera reflect images of Duvernay's residence that are visible from a publicly accessible location. Stated differently, the pole camera provided observation of Duvernay's residence from a point where law enforcement had a right to be. *See Anderson-Bagshaw* at 405, citing *Jackson* at 1281 (concluding that using pole cameras to view outdoor areas surrounding a home, which are easily observable by people passing by, does not violate the Fourth Amendment) and *United States v. Jenkins*, 124 F.3d 768, 773-774 (6th Cir.1997) ("recognizing the difference between physical invasion of curtilage and 'visual inspection for a lawful vantage point'").

**{¶23}** Nevertheless, Duvernay argues that the view from the position of the pole camera—installed higher than the height of an average person—is not the same view a passerby would enjoy. However, this distinction does not confer a reasonable expectation of privacy because the view of the pole camera is the view available to a utility worker on the pole overlooking Duvernay's residence—that is, Duvernay could reasonably expect that an AEP utility worker would climb the pole and see what the pole camera saw. *See id.* at 404, citing *Ciraolo* at 214-215 (noting that, if power-company-repair mechanic can view items in plain view from a utility pole overlooking that person's property, there is no reasonable expectation of privacy from government agents viewing by use of the pole camera those items from the same position); *Houston* at 288-289. *See also Little* at ¶ 25.

{¶24} Furthermore, passersby had unimpeded visual access of the areas surrounding Duvernay's residence, including visual access of the attached garage when the garage door was open. *Compare Wymer*, 654 Fed.Appx. at 743; *Houston* at 288. Stated differently, Duvernay made no attempt to shield his residence with any type of privacy fence from the view of passersby. Thus, Duvernay's "Fourth Amendment rights were not violated, because he has no reasonable expectation of privacy in what he 'knowingly exposes to the public.'" *Houston* at 288, citing *Katz*, 389 U.S. at 351. *See also State v. Casey*, 2d Dist. Miami No. 99-CA-43, 2000 WL 679013, *3 (May 26, 2000) (noting that law enforcement's "open observations of an area within the curtilage" are "not a subject of Fourth Amendment protection" if "a person knowingly exposes [views of the curtilage] to the public"), citing *Ciraolo* at 214 and *Katz* at 351.

{¶25} Further, the length of time of the surveillance does not render the video recordings unconstitutionally unreasonable because it was possible for law enforcement to have engaged in live surveillance of Duvernay's residence for nine days—the amount of time that law enforcement monitored footage from the pole camera from its installation on October 6 until Duvernay's arrest on October 15, 2015. *Compare Houston* at 289 (concluding that 10 weeks is not an unconstitutionally unreasonable amount of time to surveil a person's residence with a pole camera). For these reasons, there is competent, credible evidence supporting

the trial court's determination that law enforcement's use of the pole camera did not violate Duvernay's Fourth Amendment right to privacy. Therefore, the trial court did not err in denying Duvernay's motion to suppress evidence obtained from the pole camera.

{¶26} In his second assignment of error, Duvernay argues that there was insufficient evidence to justify probable cause to issue the warrant of the GPS tracking devices that were installed on his vehicles.

{¶27} "The Fourth Amendment to the United States Constitution requires that warrants issue only 'upon probable cause.'" *State v. Gonzales*, 3d Dist. Seneca Nos. 13-13-31 and 13-13-32, 2014-Ohio-557, ¶ 18. "Probable cause 'means less than evidence which would justify condemnation,' so that only the 'probability, and not a prima facie showing of criminal activity is the standard of probable cause.'" *Id.*, quoting *State v. George*, 45 Ohio St.3d 325, 329 (1989). "To search for evidence of a crime there must 'be a nexus * * * between the item to be seized and criminal behavior' as well as 'cause to believe that the evidence sought will aid in a particular apprehension or conviction.'" *Id.*, quoting *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642 (1967).

> When determining "the sufficiency of probable cause in an affidavit submitted to support a search warrant, '[t]he task of the issuing [authority] is simply to make a practical, common-sense decision

whether, given all the circumstances set forth in the affidavit before him including "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"

*Id.* at ¶ 19, quoting *George* at paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317 (1983).

A reviewing court should not conduct a de novo review of a [the issuing authority's] determination of probable cause. Rather, "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed," according "great deference to the [issuing authority's] determination of probable cause" and resolving "doubtful or marginal cases in this area * * * in favor of upholding the warrant."

*Id.*, quoting *George* at paragraph two of the syllabus.

{¶28} "In sum, on appeal, when we are reviewing the issuing [authority's] determination of probable cause, the review is limited to ensuring that the [issuing authority] 'had a substantial basis for concluding that probable cause existed.'" *Id.* at ¶ 20, quoting *State v. Garza*, 3d Dist. Henry No. 7-13-04, 2013-Ohio-5492, ¶ 19, citing *George*.

{¶29} On appeal, Duvernay argues that the information provided in the search-warrant affidavit is insufficient because law enforcement "used the illegally obtained evidence from the pole camera to get a court approved search warrant for the GPS tracker." (Appellant's Brief at 15). In other words, Duvernay argues that "[t]he evidence obtained from the warrantless pole camera is tainted and was otherwise obtained through illegal means, and as the fruit of the poisonous tree the evidence obtained through the GPS tracker must also be suppressed." (*Id.* at 16).

{¶30} At the April 11, 2016 hearing, Harrod testified that law enforcement obtained a search warrant for a GPS tracking device to be installed on a 2002 black Acura CL and a 1999 Jeep Grand Cherokee—both owned by Duvernay. (Apr. 11, 2016 Tr. at 37); (Doc. No. 23). Harrod identified State's Exhibit 1 as the affidavit he prepared for the search warrant related to the Acura, the search warrant, and the inventory of that search warrant. (Apr. 11, 2016 Tr. at 38). Harrod testified that the search warrant for the GPS tracking device for the Acura was issued on September 9, 2015. (*Id.*). He identified State's Exhibit 2 as the affidavit he prepared for the search warrant related to the Jeep, the search warrant, and the inventory of that search warrant. (*Id.*). Harrod testified that the search warrant for the GPS tracking device for the Jeep was issued on September 23, 2015. (*Id.*).

**{¶31}** On cross-examination, Harrod testified that the affidavits that he submitted to obtain the search warrants contained sworn statements by Harrod from May 29, 2015. (*Id.* at 39).

**{¶32}** Notwithstanding the State's assertion that Duvernay waived his argument by failing to specifically raise it in the trial court, Duvernay's argument is misplaced for two reasons. First, based on our conclusion in Duvernay's first assignment of error, law enforcement's surveillance of Duvernay's residence by use of a pole camera did not violate his Fourth Amendment right to privacy. Second, even if law enforcement illegally surveilled Duvernay's residence with the pole camera, Duvernay's argument under his second assignment of error necessarily fails because no evidence obtained from the pole camera installed outside of Duvernay's residence was used to obtain the search warrants for the GPS tracking devices installed on Duvernay's vehicles. Indeed, the search warrants for the GPS tracking devices for Duvernay's vehicles were issued on September 9 and 23, 2015, respectively. The pole camera outside Duvernay's residence was installed on October 6, 2015. As such, Duvernay's argument raises a chronological impossibility. Therefore, the trial court did not err in denying Duvernay's motion to suppress evidence obtained from the GPS tracking devices.

**{¶33}** Duvernay's assignments of error are overruled.

**{¶34}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**